OPINION OF THE COURT
Wachtler, J.
The primary question on this appeal concerns the admissibility of a rape victim’s testimony when she has undergone hypnosis sometime prior to trial for the purpose of refreshing or restoring her memory of the incident. The trial court held that the pretrial use of hypnosis did not affect the admissibility of the victim’s testimony but only presented a credibility question for the jury. The Appellate Division reversed and ordered a new trial. The court held that hypnosis has not been generally accepted in the scientific community as a reliable method of restoring memory and that therefore the victim’s posthypnotic recollections should have been suppressed. The court noted however that on the new trial the victim could testify concerning events recalled prior to hypnosis. The prosecutor has appealed.
I
On the evening of May 19, 1978 a man broke into the victim’s Syracuse apartment, dragged her from her bed *527 and raped her in the yard behind her home. During the attack she was choked and beaten. On June 8, 1978 the defendant was arrested and subsequently indicted for rape, assault and burglary in connection with the incident.
Prior to trial the defendant moved to suppress the victim’s identification. In support of the application he noted that the victim’s hospital records indicated that she was unable to recall what happened. It was also noted that after her release from the hospital the police had arranged for her to be hypnotized by a psychologist and under hypnosis she apparently was able to identify the defendant as her assailant. The defendant contended that hypnosis “has as its core and implementation a suggestibility” and that the victim’s identification was therefore unduly suggestive as a matter of law. In the alternative he requested a hearing pursuant to United States v Wade (388 US 218).
The trial court granted the motion to the extent of ordering that a hearing be held. That court adopted what it found to be the general, if not universal, rule throughout the country at that time, that “hypnotically induced recollection, is not inadmissible as a matter of law”. The trial court held however that “where the hypnosis is conducted by or in conjunction with or under the direction of law enforcement personnel, it is clearly an identification proceeding within the meaning of CPL 710.30 and 710.20” (99 Misc 2d, at p 871). The court thus ordered a hearing “to determine whether, under the totality of the circumstances, the procedures used were so impermissibly suggestive as to give rise to the very substantial likelihood of irreparable misidentification” (99 Misc 2d, at p 872).
Following that decision the defendant asserted as an additional ground for suppression, a contention that the hypnosis had impaired his right of confrontation. He stated: “Once the hypnosis was held, as the victim cannot separate the result of the hypnosis from an independent recollection, there could never be a right of cross-examination at that point.”
The testimony at the hearing shows that in 1978 the victim lived with her husband and four-year-old son in a two-story house occupied by several families. The victim *528 and her family occupied one of two apartments on the second floor; the defendant and his female companion, Dianne, occupied the other. The two couples were well acquainted, having resided in the same building for some time. On occasion Dianne babysat for the victim’s son. Indeed several times the defendant himself had done so.
The victim’s husband worked at a nearby factory. On Friday, May 19, 1978, he worked the evening shift beginning at 6 p.m. When he returned from work shortly after 2 o’clock on Saturday morning he found his wife lying on the landing between the two apartments. She was not wearing any clothes and her body was covered with bruises, dirt and grass. She said that she had been raped.
The victim’s husband called the police and she was taken to a local hospital where she remained for several days. Immediately following her admission she was sent for a time to the intensive care unit when it was determined that her blood pressure was low and she was having difficulty breathing. She was diagnosed as suffering from traumatic injuries, particularly to her head and neck. The laboratory reports also indicate that she had been sexually attacked.
The victim originally gave no information to the authorities. An officer who arrived at the scene testified that she was hysterical and incoherent. At the hospital she refused to see Officer George Rendle, the investigator assigned to the case, when he attempted to interview her in the intensive care unit. Later in the day she informed him that she did not know what happened. She made similar responses when questioned by hospital personnel. However, when her sister visited her and asked on several occasions who had done this to her she finally stated: “I saw Kirk”. Kirk is the defendant’s first name.
On that same day Officer Rendle had independently concluded that the defendant was the prime suspect after making inquiries in the neighborhood and learning from another officer that the defendant had recently been arrested and charged with a rape committed in April. That afternoon he questioned the defendant at police headquarters located in the Public Safety Building in Syracuse. At *529 that time the officer noticed and photographed scratches on the defendant’s back. The defendant also made a potentially incriminating statement which was subsequently suppressed on the ground that he had not been advised of all of his rights. Later the officer went to the defendant’s apartment where Dianne turned over certain items of clothing belonging to the defendant. That evening the victim’s husband saw a photograph of the defendant in Officer Rendle’s file and learned that the police suspected the defendant of the rape. However at the officer’s request he agreed not to inform his wife of this.
On May 22 Officer Rendle returned to the hospital with Officer Denise Banazek and found the victim more responsive. He testified that on this occasion the victim told him that on the night of the attack she put her son to bed early and went to bed herself sometime before 9 o’clock. She left the door unlocked for her husband who did not have his key. She next recalled someone grabbing her by the throat and dragging her down a flight of stairs. She also recalled that there was another person outside talking to her attacker. This other person did not hurt her and ran away while the attack on her continued. She said that her attacker wore eyeglasses and had smooth hair which was not very long.
On May 24 Officer Rendle spoke to the victim again, this time at her sister’s home. The officer testified that during this interview she stated “it wasn’t clear, things were not quite clear but [she] kept remembering Kirk. She stated this occurred while she was in the hospital and her head stopped spinning”. They also discussed hypnosis and the victim agreed to try anything that would help her recall the man who had attacked her. That same day the officer called Dr. Jay M. Land, a clinical psychologist in private practice, and told him that he was investigating a rape or assault in which the victim could not identify her attacker. He also indicated that there was a suspect but at the doctor’s request did not identify him or reveal any of the details of the investigation. The psychologist agreed to meet with the victim and an appointment was made for the interview. Sometime prior to that meeting the victim’s *530 husband told her that the police suspected the defendant of the rape.
The first hypnotic session took place at the Public Safety Building on June 7. A preliminary meeting between Dr. Land, the victim and her husband was not recorded. The remainder of the session, lasting approximately an hour and a half, was recorded on video tape. At the victim’s request her husband was present. Officer Rendle and the officer operating the recording equipment also attended. In response to one of Dr. Land’s questions before the induction, the victim stated that she knew the police had a suspect but she hoped it" wasn’t the defendant. Dr. Land then proceeded to hypnotize her and asked her to imagine that she was watching a television on which she could see what had occurred in her room on the night of May 19. This proved unsuccessful and she was awakened. However she agreed to try again, was again placed in a hypnotic state and this time identified the defendant as her attacker. When she was awakened she recalled identifying the defendant and confirmed the identification. At that point the recording equipment was turned off. She was asked several questions by Officer Rendle and gave him an affidavit identifying the defendant as the man who had raped and-beaten her.
Subsequently the victim read in the newspapers about the possible effects of prehypnotic suggestions and decided to consult a psychiatrist, Dr. Goldfarb, to make sure she was not being forced to remember something that was not true. That led to three meetings with Dr. Goldfarb, all of which were recorded on audio tape. At the first meeting on June 20 she informed the psychiatrist that she had been attacked and raped and was attempting to recall a man’s name. She also told him that she had been hypnotized and that some information had “come out” during that session and she wanted to find out whether it was true. During that meeting Dr. Goldfarb hypnotized her but she could only remember someone’s hand around her throat and mouth and nothing beyond that.
On June 24 Dr. Goldfarb again placed her under hypnosis but encountered the same “block”. He then suggested *531 that they use sodium pentothal, a so-called “truth serum”. She agreed and an appointment was made for July 11.
Before her next meeting with Dr. Goldfarb, the victim was again hypnotized by Dr. Land on June 27. However at this session, which was recorded on audio tape, she could not remember any more than she had at the first session with Dr. Land.
On July 11, Dr. Goldfarb administered sodium pentothal to the victim at St. Joseph’s Hospital. While under the influence of this drug she recalled being raped outdoors by the defendant. She also recalled that the defendant’s brother was present and attempted to talk the defendant out of it. On July 22 she told Officer Rendle that the defendant’s brother was the second man in the backyard.
At the hearing the People also called several neighbors for the purpose of corroborating the victim’s recollections. Anna De Pasquale, who resided in the house adjoining the victim’s, testified that she was sitting on her porch at about 10 o’clock on the evening of May 19 when she saw the defendant arrive home. Mrs. De Pasquale’s daughter, Ann Brown, recalled that at approximately 10:15 that evening, while she was upstairs reading, she heard a child “really screaming” in the victim’s house, and then heard a woman shouting “what are you doing here. What do you want, get out”. A few minutes later she heard a thumping noise “like something going” down the stairs, followed by a child crying: “Mommy, where are you”? Shirley Thomson, a neighbor residing directly across the street, also heard a child crying and saw him in the window of the victim’s apartment calling for his mother. She then saw the child come downstairs, look around and return upstairs. Shortly after 11 o’clock, while Mrs. Thomson was standing on the sidewalk in front of her home, she saw the defendant emerge from the alleyway next to his home and proceed up the stairs. These neighbors had all resided in the neighborhood for several years and were acquainted with the defendant.
After the hearing the court filed a written opinion in which- it concluded that the People had shown by clear and convincing evidence that the hypnotic procedures em *532 ployed by Dr. Land were not impermissibly suggestive under the totality of the circumstances. Recognizing the suggestibility of the person who has been hypnotized, and the potential for abuse, the hearing court adopted an extensive set of safeguards to be followed by the police and the hypnotist whenever there is a possibility that the person undergoing hypnosis may be later called to testify at trial. The court held that “although not each of these safeguards was adhered to strictly and a few not at all * * * there was substantial compliance such that the defendant’s rights were adequately protected”. The court also stated that all facts given during the session should be corroborated as far as possible because “all professionals agree that no examiner can be certain that the responses of the subject are free from confabulation” or can be considered reliable without independent verification. On this point the court concluded that the neighbors’ testimony as well as the statement the victim made to her sister in the hospital “although circumstantial in nature, tends to verify the accuracy of the hypnotically aided recall”.
At the trial the victim testified to the events as recalled both prior to and following the various hypnotic sessions and identified the defendant as her attacker. The jury found the defendant guilty of rape, burglary and assault.
The Appellate Division reversed in an opinion in which a majority of the court found that the trial court’s decision “runs counter to the thrust of recent holdings in other jurisdictions that such evidence should not be permitted” unless it satisfies the criterion for the admission of scientific proof (88 AD2d, at p 19). The majority concluded: “From our reading of recent decisions in the field and of recognized authorities * * * we are persuaded that hypnotically produced testimony is not generally accepted in the scientific community as reliable and that it should therefore, be inadmissible” (88 AD2d, at p 21). However, as noted, the majority also indicated that upon the new trial the victim would not be precluded from testifying to facts recalled prior to the first hypnotic procedure. One Justice dissented on the ground that hypnotically refreshed recollections should be admissible when corroborated by other *533 evidence, and concluded that in this case there was sufficient corroboration.
II
Although hypnosis has long been regarded with suspicion or disapproval as one of the dark arts, it is now recognized as a procedure having a scientific basis, not fully understood but proven capable of producing useful or beneficial results in limited contexts. It has frequently been employed to check compulsive habits, alleviate pain and, less frequently, to perform operations without anesthesia. It is also employed with some regularity in the diagnosis and treatment of mental disorders including amnesia (9 Encyclopaedia Britannica, Macropaedia [1981] Hypnosis, p 133). In the 1950’s hypnosis was formally acknowledged by the major medical associations as an accepted procedure for medical use (see Council on Mental Health, Medical Use of Hypnosis, 168 JAMA 186, 187; Cheek & Le Cron, Clinical Hypno-therapy [1968], p 19).
In recent years it has also been used to obtain leads in criminal investigations. Hypnosis has been credited with furnishing the crucial lead, a license plate number, in a California case involving the kidnapping of 26 children from a school bus. It was also reported as instrumental in another celebrated case involving the murder of a cellist at the Metropolitan Opera in New York (see Hypnotism v Crime: A Powerful Weapon or an Abused Tool? New York Times, Oct. 14, 1980, col 1). Its failures understandably have received less attention, but it is clear from the scientific journals which study and report on the phenomenon, that the use of hypnosis in criminal investigations produces at best mixed results.[1] Nevertheless law enforcement authorities are increasingly resorting to hypnosis to obtain leads, particularly in cases where traditional police procedures have been fruitless.[2] In fact many law enforcement *534 agencies are now having officers trained in the use of hypnosis, who are sometimes referred to as members of the Svengali Squad.[3]
The latest, and most controversial development, involves the attempt by litigants to introduce hypnotically induced statements as evidence in civil and, more commonly, criminal trials.[4] The suitability of utilizing hypnotic results in legal proceedings has not been endorsed by scientific experts. On the contrary their response essentially has been either to condemn the practice[5] or caution that it be used very sparingly and then only under limited and controlled circumstances.[6]
The basic problem with admitting hypnotically generated statements or recollections in evidence is that hypnosis is an inherently suggestive procedure.[7] In fact suggestion is the method or mechanism used to induce the hypnotic state.[8] Of course the power of suggestion does not affect all people to the same extent and, indeed, has little or no effect on some.[9] It is recognized, however, that the hypnotic subject will be affected to some degree in three primary respects.
First, a person who has been hypnotized becomes increasingly susceptible to suggestions consciously or unconsciously planted by the hypnotist or others present during *535 the session. The place at which the procedure is employed and the purpose for conducting it may also suggest or affect the outcome.[10]
Second, the subject himself may confabulate, that is imagine incidents to fill memory gaps, by for instance imagining that he has experienced something he has simply heard from others. He may also intentionally fabricate events perceived to be beneficial to himself or those conducting the hypnotic session.[11]
Third, a person who has recalled an incident under hypnosis will experience an increased confidence in his subsequent recollection of that incident.[12]
These effects have been demonstrated under experimental conditions. In one series of experiments, involving age regression, hypnotic subjects were able to recall, with great detail and convincing manner, events or incidents from their childhood which upon investigation often proved to be totally unfounded.[13] A more dramatic illustration is provided by experiments with age progression in which the hypnotized persons recalled, with equal specificity and conviction, events which “happened” in the future.[14] In these instances the defects in hypnotically induced recollection were easily detected by reference to known facts. When such verification is not available, there is no currently accepted method for scientifically determining the reliability of hypnotically induced recollection.[15]
These are points on which all of the experts who testified at the hearing in this case agreed and, as indicated, they are supported by the literature on the subject. Indeed the *536 Executive Council of the Society for Clinical and Experimental Hypnosis has formally adopted the following resolution: “Because we recognize that hypnotically aided recall may produce either accurate memories or at times may facilitate the creation of pseudo memories, or fantasies that are accepted as real by subject and hypnotist alike, we are deeply troubled by the utilization of this technique among the police. It must be emphasized that there is no known way of distinguishing with certainty between actual recall and pseudo memories except by independent verification”. (27 Int J of Clinical & Experimental Hypnosis 452.)
In the clinical setting where the goal is to relieve distress, and not compile an accurate account of a past event, the inherent suggestibility of the hypnotic procedure is generally beneficial to the patient. In criminal investigations the fact that a hypnotized witness may furnish a false lead is hardly beneficial but often worth the time needed to pursue it if no other leads are available. Scientific experts have no general objection to the investigative use of hypnosis provided the posthypnotic recollections are used only as leads to other evidence which then serves to solve or prove the crime. The potential unreliability of the hypnotic statements will be resolved or rendered moot as soon as the lead has been investigated. But the side effects of hypnosis cannot be so easily discounted if the hypnotically induced statements are later sought to be introduced at trial.
Ill
Although this is the first case to present, the issue to this court,[16] it has been extensively litigated in other jurisdictions both State and Federal.[17] Most of the cases are of recent origin and as the decisions of the lower courts in this case indicate, the results have been diverse.
*537 At the center of the controversy is the question as to whether the general rule governing the admissibility of scientific evidence applies to hypnotic recall. That rule, originally formulated in Frye v United States (293 F 1013), provides that scientific evidence will only be admitted at trial if the procedure and results are generally accepted as reliable in the scientific community.[18]
There appears to be general agreement among the courts that the Frye rule applies to, and renders inadmissible, statements made by a witness under hypnosis when the statements are offered for the purpose of verifying the truth of the witness’s trial testimony.[19] Typically this evidence is offered by the defendant[20] to bolster his version of the facts[21] or to undermine a confession which conflicts with his testimony at trial.[22] The first court to consider the point bluntly stated that the law “‘does not recognize hypnotism’ ” (People v Ebanks, 117 Cal 652, 665 [1897]). More recent cases note that there is no generally accepted scientific method for determining whether a statement made under hypnosis is an accurate recollection, deliberate fabrication or unwitting confabulation. In these cases hypnosis is frequently analogized to truth serums and lie detectors, the results of which are generally excluded at trial on similar grounds.[23]
The cases which have produced disagreement are, like the one now before us, cases in which hypnosis has been employed to refresh or restore the memory of a witness to events which might have been forgotten, overlooked or, *538 occasionally, even repressed following a traumatic event. In these cases the evidence offered at trial is not the actual statements made by the witness while under hypnosis, but the witness’s present recollection which, in theory, has simply been refreshed by hypnosis sometime prior to trial. And like the present case, the evidence is usually offered by the prosecutor in a case where hypnosis has been employed sometime prior to trial in an effort to restore or enhance the recollection of a victim or witness to a crime in order to aid the investigation or provide testimony for trial.[24]
The initial reaction in other jurisdictions was to treat hypnotically refreshed recollections as no different from recollections refreshed in other legally acceptable ways. The first court to confront the problem was the Maryland Court of Special Appeals which in the 1969 case of Harding v State (5 Md App 230, cert den 395 US 949) held that the use of hypnosis for this purpose affected only the weight of the evidence not its admissibility. That decision was based on the testimony of a single expert who stated that he “seriously doubtjed]” that a person’s recollections during hypnosis might be affected by suggestions made by others. The court observed (5 Md App, at p 246) that “some" authorities warn that fancy can be mingled with fact”, but the court made no effort to determine which view prevailed in the scientific community. In fact the Frye test for the admissibility of scientific evidence was not adopted in Maryland until 10 years later (Reed v State, 283 Md 374). Following its adoption, the court which had initiated the Harding rule reexamined it and overruled it (see Polk v State, 48 Md App 382; Collins v State, 52 Md App 186). By that time it had become evident that the view expressed by the expert in Harding was not shared by scientific experts specializing in hypnosis.[25]
Until 1980 the Harding rule had been uniformly, almost automatically, followed in other jurisdictions and still commands a majority.[26] In the last few years, however, most *539 courts considering the problem for the first time have applied the Frye test, but differ as to its consequences.
The New Jersey Supreme Court, noting that hypnosis is a scientifically accepted technique for treating amnesia, has held that the risk of suggestibility inherent in the procedure may be minimized if a series of standards or safeguards, proposed by various experts, are observed by those administering the hypnosis (see, e.g., State v Hurd, 86 NJ 525). In that case however, the court held the hypnotically refreshed recollection inadmissible because the hypnotic session had not been conducted in accordance with the prescribed standards (see, also, State v Beachum, 97 NM 682, adopting the Hurd standards and holding that the trial court did not abuse its discretion in excluding posthypnotic recollections or in admitting those recalled prior to hypnosis).
Other courts have more broadly held that hypnotically refreshed recollection fails the Frye test because at the present time hypnosis is not generally accepted as a reliable method of restoring memory. They consider the proposed standards ineffective or judicially unworkable (see, e.g., People v Gonzalez, 108 Mich App 145; Commonwealth v Nazarovitch, 496 Pa 97; State v Palmer, 210 Neb 206; Commonwealth v Kater, 388 Mass 519) and note that there is no scientifically accepted method for determining whether the subject himself has fabricated or confabulated the events recalled under hypnosis. These courts hold that events recalled after hypnosis should not be admitted at trial but that the witness may be permitted to testify to events recalled prior to hypnosis.[27] This view has been characterized as the “emerging consensus” (State v Wren, 425 So 2d 756, 760 [La]).
The most extreme view thus far adopted in the other jurisdictions is that a witness who has been hypnotized is *540 “contaminated” and is incompetent to testify, even to events recalled prior to hypnosis.[28] It is reasoned that merely excluding the posthypnotic recollections does not completely eliminate the impact of the hypnotic session because the added confidence the witness has obtained remains and may, hinder effective cross-examination. The logical purity of the rule is illusory. It has been applied to exclude the testimony of the victim and presumably other prosecution witnesses, but has not been carried so far as to preclude a defendant from testifying on his own behalf if he had previously employed hypnosis to refresh his recollection.[29] Thus complete logical extension of this rule has been checked when logic would conflict with principles more important in the administration of criminal justice. This view was initiated by the Arizona Supreme Court (State v Menna, 128 Ariz 226). It was later adopted by the Supreme Court of California (People v Shirley, 31 Cal 3d 18) at about the same time Arizona abandoned it in favor of the rule permitting a witness to testify to prehypnotic recollection (State ex rel. Collins v Superior Ct., 132 Ariz 180). At the present time the former Arizona rule is followed only in California.
Some States have rejected both the Frye test as well as the old Harding rule, that hypnotically refreshed recollections raise only questions of credibility, preferring a case-by-case approach which focuses on the suggestibility of the particular hypnotic session and the reliability of the recollections under the totality of the circumstances (see, e.g., State v Armstrong, 110 Wis 2d 555). The Harding rule itself has gained few adherents in the last few years, principally in cases where hypnosis contributed little or nothing to the witness’s initial recollections (Chapman v State, 638 P2d 1280 [Wyo]; Pearson v State, 441 NE2d 468 [Ind]; State v Wren, 425 So 2d 756 [La], supra).
In short the law is in a state of flux and there is no rule which will entirely satisfy all the demands of logic, policy and practicality.
*541 IV
The prosecutor urges that the Harding rule is still the most appropriate one to apply to recollections refreshed by hypnosis. He notes that the testimony will come from a lay witness and not an expert claiming scientific endorsement for the procedure employed. This, he contends, should eliminate the primary difficulty with scientific proof, namely that the jury or fact finder may be unduly impressed with the scientific and presumably reliable basis for the evidence presented. He also notes that the rules of evidence generally permit a witness to testify from present recollection even when the recollection has been refreshed in ways which have not met with scientific approval. Although he recognizes that the use of hypnosis to refresh recollection is relatively new and unusual he urges that it is no worse than the other methods currently accepted in the law.
In essence then the prosecutor urges that we extend the rules relating to refreshed recollection and give a more restricted reading to the rule governing the admissibility of scientific proof. However, the current trend of the law, when dealing with suggestive or scientific procedures relating to eyewitness testimony, particularly in this State has been to take the opposite course.
It is now clear that the police cannot refresh a witness’s recollection by use of a suggestive pretrial identification procedure, and that such practices might violate the defendant’s right to due process (Stovall v Denno, 388 US 293, 302). The Supreme Court has also held that the defendant has a right to counsel at identification proceedings occurring after the commencement of the criminal action (United States v Wade, 388 US 218, supra). These rules were prompted by increased judicial sensitivity to the fact that “[t]he influence of improper suggestion upon identifying witnesses probably accounts for more miscarriages of justice than any other single factor — perhaps it is responsible for more such errors than all other factors combined” (Wall, Eye-Witness Identification in Criminal Cases, p 26, *542 quoted in United States v Wade, supra, at p 229). The vagaries of eyewitness identification have long been a concern of this court which has on occasion gone further than the Federal Constitution requires in order to further minimize the risk of mistaken identification (see, e.g., People v Adams, 53 NY2d 241).
Similarly, when presented with scientific evidence purporting to gauge the credibility of participants or witnesses to a criminal incident, we have established a very high level of reliability, tantamount to certainty, as a predicate for its admissibility (People v Leone, 25 NY2d 511). Although ordinary scientific proof need not meet such a demanding standard, the increased certitude has been found appropriate when the fallibility of the scientific procedure might directly affect the fact finder’s assessment of eyewitness credibility (People v Allweiss, 48 NY2d 40, 50).
Hypnotically refreshed recollections pose analogous problems. Because hypnosis is an inherently suggestive procedure, its use by the police to obtain an identification or details concerning a crime may, if impermissibly suggestive, violate the defendant’s constitutional rights. The constitutional cases usually deal with identifications by strangers. The principles, however, would also seem to be applicable to cases, such as this one, in which the parties were well acquainted but the victim or witness experienced some difficulty in describing the event or making an identification because of the circumstances under which the crime was committed. The constitutional restrictions aimed at curtailing improperly suggestive police procedures, would not apply to hypnosis employed by private individuals without any police involvement. The common-law rules of evidence, on the other hand, are not so limited in their application and do not require an element of State action. We do not rely on the constitutional questions for the resolution of this case.
Contrary to the prosecutor’s contention, hypnosis is not comparable to the other methods of refreshing recollection long accepted at common law. Indeed if the prosecutor’s *543 point were well taken there would be no need, when the other means were available, to employ hypnosis. One of the legally endorsed techniques for reviving a witness’s recollection would do just as well.[30] What distinguishes hypnosis is the fact that suggestion is an essential and inseparable part of the process which alters a witness’s consciousness and makes him more prone to suggestion and to recall events inaccurately than he would in a normal state of consciousness.[31] In fact, it is a scientific process and the recollections it generates must be considered as scientific results (see, e.g., Polk v State, 48 Md App 382, supra). Certainly a layman could not assess those results without expert guidance and might be unduly impressed by the witness’s enhanced recollections if he mistakenly viewed them as the result of normal recall.
The question then is whether the results are generally accepted as reliable in the scientific community. Because hypnosis is only intended to restore memory loss, and not to gauge the truth of the subject’s statements, it would seem that the proper inquiry is whether hypnosis has gained general acceptance in the scientific community as a reliable means of restoring recollection.[32] It is evident, however, that at the present time hypnosis has not achieved that status. As noted it has been scientifically demonstrated that it produces recollections which may contain a mixture of accurate recall, fantasy or pure fabrication in unknown quantities.
The standards adopted by the trial court in the case now before us (see, also, State v Hurd, 86 NJ 525, supra) although proposed by leading experts would only provide a partial solution even if strictly followed.[33] The primary *544 purpose of those standards is to govern the conduct of the police and the hypnotist so as to minimize or hopefully eliminate the possibility of suggestion coming from those parties. This, however, is not the major problem. As one commentator has observed: “The greatest variable in the hypnosis of an individual is the individual himself”.[34] No procedures have yet been devised for eliminating the common risk that the subject himself is more likely to confabulate or fantasize to fill in gaps in his memory as a result of the hypnotic process. Nor is there any scientific method for detecting this type of “recollection”, absent objective external verification of the statements generated by the hypnotic session.[35]
We note that even if we had found that the proposed standards provided an effective means of insuring reliable recall under hypnosis, they could not be said to have been adequately met in this case. The information provided by the police to the hypnotist concerning the crime was not furnished in writing or otherwise recorded. Police officers, as well as the victim’s husband, were present at the initial hypnotic session when the victim made her first positive identification of the defendant. Indeed, the hypnotic session was not held in a neutral setting, but at the police headquarters. In addition, and most significantly, the victim knew that the police had a suspect and knew that it was the defendant because her husband had informed her of this sometime prior to the first hypnotic session.
Neither can it be said that there was any objective verification of the victim’s recollections. This, of course, was not a classic case where the police had no suspect and *545 needed to employ hypnosis in order to obtain leads for further investigation. There is no showing on the record that the hypnotic sessions with the victim provided any leads or information which the police did not already possess. Indeed it appears that the victim’s recollections under hypnosis had the opposite effect of confirming or validating the suspicions of the police, to which she was unfortunately privy.
In sum, the Appellate Division correctly held that the defendant is entitled to a new trial because the trial court should not have permitted the victim to testify to events recalled after the hypnotic sessions. However, since there must be a new trial, we note our agreement with those courts which have concluded that the pretrial use of hypnosis does not necessarily render the witness incompetent to testify to events recalled prior to being hypnotized.
As indicated, hypnosis has proven to be a useful and apparently essential investigative tool for generating leads in cases where normal police procedures have proven inadequate, although its use to confirm police suspicions, or prepare a witness for trial is more dubious and is not to be encouraged.[36] It also appears that hypnosis has become a fairly standard course of medical treatment for amnesia resulting from traumatic events,, including witnessing or being victimized by a criminal act. A criminal trial for rape or assault would present an odd spectacle if the victim was barred from saying anything, including the fact that the crime occurred, simply because he or she submitted to hypnosis sometime prior to trial to aid the investigation or obtain needed medical treatment. Even in cases dealing with the frailties of eyewitness identification some allowance must be made for practicalities (see, e.g., Stovall v Denno, 388 US 293, 301-302, supra).
When confronted with suggestive pretrial identifications it has not been found necessary to preclude the witness from making an in-court identification on the basis of *546 recollections prior to the suggestive procedure, if it is found as a fact that he can do so without relying on the improperly made identification (see, e.g., People v Adams, 53 NY2d 241, supra). A similar procedure would seem to be appropriate in cases involving the pretrial use of hypnosis (see, e.g., State v Palmer, 210 Neb 206, supra; State ex rel. Collins v Superior Ct., 132 Ariz 180, supra; Commonwealth v Kater, 388 Mass 519, supra).
The major difficulty, of course, is that a witness who has been hypnotized acquires an increased confidence in his recollections, presumably greater than the witness who has experienced a suggestive identification, which could inhibit the defendant’s right of cross-examination. The problem is greatest when the hypnotist suggests to the person under hypnosis that a certain event occurred or that the person will recall everything when he returns to the normal state of consciousness. Absent such suggestions it appears that the degree of confidence gained through hypnosis depends upon the individual’s belief in the ability of hypnosis to yield the truth, the degree to which he has been hypnotized and the extent to which those administering the hypnosis have observed the standards recommended by the experts.[37] Indeed in some cases where the witness was quite confident in his initial recollections and hypnosis was employed unsuccessfully to yield additional details, there may be little or no impairment of the defendant’s power to cross-examine. In any event these are questions which the trial court should resolve at a pretrial hearing.
It would appear that two aspects of the matter warrant inquiry and resolution at the pretrial stage — the extent of the witness’s prehypnotic recollection (which would establish the boundaries of admissible testimony)[38] and whether the hypnosis was so impermissibly suggestive as to require exclusion of in-court testimony with respect to such prehypnotic recollection. Little reported authority is avail *547 able as a basis on which to prescribe guidelines for such inquiry and resolution. Experience and determination on a case-by-case basis will be required before procedural standards can be properly enunciated with any degree of definiteness.
As to the scope and content of the prehypnotic recollection of the witness, it would seem that evidence, testimonial and documentary, which is material to the determination thereof should be received at the pretrial hearing, without rigid application of the hearsay rule.[39] The proof to establish the extent of the witness’s unaided recollection of the particular criminal transaction will necessarily vary from case to case and will depend on what procedures were followed and what events occurred before the hypnosis. To the extent practicable full opportunity should be afforded counsel to test the probative worth of the proof offered.
With respect to the hypnosis itself, detailed proof should be introduced as to the precise procedures that were followed in the particular instance, including measures taken to reduce the risk of impermissible suggestiveness. At this point the standards or guidelines proposed by the experts for the conduct of hypnotic sessions in connection with criminal investigations may be pertinent.[40] Here, too, experience will be the best teacher, and it would be inappropriate in this case to undertake the formulation of rigid guidelines.[41]
Because of the unique and sometimes unfathomable consequences of hypnosis, the People should assume the burden of demonstrating by clear and convincing proof that the testimony of the witness as to his or her prehypnotic recollection will be reliable and that there has been no substantial impairment of the defendant’s right of cross-examination. If the witness is held to be competent to *548 testify, the defendant, of course, has the option at trial of introducing proof with respect to the hypnotic procedures followed as well as expert testimony concerning the potential effect of the hypnosis on the witness’s recollections. And since there is general agreement in the scientific community that a witness who has been hypnotized usually acquires some measure of confidence in events recalled under hypnosis, the court should charge the jury to that effect if the defendant requests it. In our view these measures represent a reasonable accommodation between the legitimate uses of hypnosis and the defendant’s right of confrontation.[42]
In the present case where the trial court erroneously concluded that hypnosis was a reliable means of refreshing a witness’s recollection, it was not necessary for the court to consider, or the People to address, the separate question as to whether the witness’s prehypnotic recollections were unduly influenced by the hypnotic sessions. Thus on the retrial the court should consider the issue at a pretrial hearing.
For the reasons stated, the defendant is entitled to a new trial to be held in accordance with this opinion, and the order of the Appellate Division should be affirmed.
Chief Judge Cooke and Judges Jasen, Jones, Meyer and Simons concur.
Order affirmed.

. See, e.g., Orne, Use and Misuse of Hypnosis in Court, 27 Int J of Clinical & Experimental Hypnosis, No. 4, pp 311, 318, 333-334; see, also, Putnam, Hypnosis and Distortions in Eyewitness Memory, 27 ínt J of Clinical & Experimental Hypnosis, No. 4, p 437, for an experimental study demonstrating the potential for inaccurate recall in criminal investigations.

. Diamond, Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness, 68 Cal L Rev 313; Levitt, Use of Hypnosis to “Freshen” the Memory of Witnesses or Victims, 17 Trial 56; see, also, Putnam, supra, n 1, at p 438.

. Putnam, supra, n 1, at p 438.

. See, e.g., Spector & Foster, Admissibility of Hypnotic Statements: Is the Law of Evidence Susceptible? 38 Ohio St LJ 567; Dilloff, Admissibility of Hypnotically Influenced Testimony, 4 Ohio Northern U L Rev 1; Thigpen, Safeguards Against Suggestiveness: A Means for Admissibility of Hypno-Induced Testimony, 38 Wash & Lee L Rev 197; Note, Admissibility of Testimony Influenced by Hypnosis, 67 Va L Rev 1203; Alderman and Barrette, Hypnosis On Trial: A Practical Perspective on the Application of Forensic Hypnosis in Criminal Cases, 18 Grim L Bull 5; Falk, Posthypnotic Testimony — Witness Competency and the Fulcrum of Procedural Safeguards, 57 St John’s L Rev 30.

. Diamond, supra, n 2 (the author is both a Professor of Law and Clinical Professor of Psychiatry).

. Orne, supra, n 1; Putnam, supra, n 1; Levitt, supra, n 2.

. 9 Encyclopaedia Britannica, Macropaedia (1981), Hypnosis, pp 133, 134 (hereafter Britannica); Diamond, supra, n 2, at p 333; Levitt, supra, n 2, at p 56; Spector & Foster, supra, n 4, at p 570; see, also, Coleman, Abnormal Psychology and Modern Life (2d ed, 1960), p 579.

. 9 Britannica, supra, n 7, at p 135; see, also, Bernheim, Hypnosis & Suggestion in Psychotherapy (Univ Books, 1964), pp 1-8.

. See Spector & Foster, supra, n 4, at p 575; 9 Britannica, supra, n 7, at p 138.

. Cheek & Le Cron, Clinical Hypnotherapy (1968), p 13; Orne, supra, n 1, at pp 328-331; Putnam, supra, n 1; Levitt, supra, n 2; Diamond, supra, n 2, at pp 314, 333; Spector & Foster, supra, n 4, at pp 578, 591-593; Dilloff, supra, n 4, at p 7; see, also, State v Mack, 292 NW2d 764 (Minn).

. Orne, supra, n 1, at p 313; 9 Britannica, supra, n 8, at p 139; Diamond, supra, n 2, at p 314; Spector & Foster, supra, n 4, at pp 577, 588; Putnam, supra, n 1, at pp 444-445.

. Orne, supra, n 1, at p 332; Putnam, supra, n 1, at p 444; Diamond, supra, n 2, at pp 339-340; 9 Britannica, supra, n 8, at p 139.

. Orne, supra, n 1, at pp 317-318.

. Orne, supra, n 1, at pp 321-322.

. Orne, supra, n 1, at p 318; Diamond, supra, n 2, at p 337; Hilgard, Experience of Hypnosis (1968), pp 164-175.

. In People v Fisher (53 NY2d 907) the issue was argued but not reached because it had not been properly preserved at trial. In an earlier case (People v Leyra, 302 NY 353) a defendant’s contention that a confession should have been suppressed because it was obtained by hypnosis was rejected in light of a factual finding that he had not been hypnotized. The confession, however, was suppressed because it was found to be involuntary under all the circumstances.

. See Admissibility of Hypnotic Evidence at Criminal Trial, Ann., 92 ALR3d 442. The issue has also been considered by several lower courts in this State (see, e.g., People *537 v McDowell, 103 Misc 2d 831; People v Smith, 117 Misc 2d 737). For cases considering its admissibility at civil trials see, e.g., Wyller v Fairchild Hiller Corp. (503 F2d 506); Kline v Ford Motor Co. (523 F2d 1067).

. This basic rule has also been applied in New York (see, e.g., People v Leone, 25 NY2d 511 [lie detector evidence inadmissible]; People v Allweiss, 48 NY2d 40, 50 [evidence of hair comparisons admissible]; People v Middleton, 54 NY2d 42 [evidence of bite mark tests admissible]).

. See, e.g., State v Pusch, 77 ND 860; Greenfield v Commonwealth, 214 Va 710; Creamer v State, 232 Ga 136; Jones v State, 542 P2d 1316 (Okla); State v Conley, 6 Kan App 2d 280; also, see, Ann., 92 ALR3d 442, at § 7, pp 458-461.

. See Ann., 92 ALR3d 442, at pp 446-447.

. See, e.g., State v Conley, supra; Jones v State, supra.

. See, e.g., People v Hangsleben, 86 Mich App 718.

. See Ann., 92 ALR3d 442, at § 7, pp 458-461.

. See Ann., 92 ALR3d 442, at pp 446-447; see, also, State v Mack, 292 NW2d 764, 770-771 (Minn).

. See authorities cited, supra, nn 7-10.

. See Note, Safeguarding Admissibility of Hypnotically Enhanced Testimony, 5 Western New Eng L Rev 281, 287, 289; Ann., 92 ALR3d 442.

. See, e.g., State v Mack, 292 NW2d 764 (Minn); State v Koehler, 312 NW2d 108 (Minn); State v Mena, 128 Ariz 226; State ex rel. Collins v Superior Ct., 132 Ariz 180; People v Gonzalez, 108 Mich App 145; People v Wallach, 110 Mich App 37; Commonwealth v Nazarovitch, 496 Pa 97; Commonwealth v Taylor, 294 Pa Super Ct 171; State v Palmer, 210 Neb 206; State v Patterson, 213 Neb 686, 381 NW2d 500; Commonwealth v Kater, 388 Mass 519; see, also, Collins v State, 52 Md App 186.

. State v Mena, 128 Ariz 226; People v Shirley, 31 Cal 3d 18; see, also, Diamond, 68 Cal L Rev 313.

. People v Shirley, supra, n 28.

. As one outstanding scientific expert on hypnosis has observed: “It is ironic that this kind of disclaimer is made by the very individuals who tout the unique effectiveness of hypnosis as an aid to criminal investigation. One cannot have it both ways!” (Orne, supra, n 1, at p 326.)

. See, e.g., Putnam, supra, n 1, at p 437; Diamond, supra, n 2, at pp 341-342; Spector & Foster, supra, n 4, at p 570; 9 Britannica, supra, n 7, at pp 136-137.

. See, e.g., State v Hurd, 86 NJ 525; People v Gonzalez, 108 Mich App 145; Commonwealth v Kater, 388 Mass 519.

. In Hurd the court adopted six standards or guidelines proposed by Dr. Ome in the trial court, which may be briefly summarized as follows: (1) the hypnotic session should *544 be conducted by a psychiatrist or psychologist experienced in the use of hypnosis; (2) he or she should be independent, not regularly employed by either party; (3) any information given to the hypnotist should be recorded; (4) before inducing hypnosis the hypnotist should obtain a detailed description of the facts the subject presently recalls, and should avoid influencing the description; (5) all contacts between the hypnotist and the subject should be recorded; (6) only the hypnotist and the subject should be present during any phase of the hypnotic session.

. Dilloff, supra, n 4, at p 5.

. See Resolution of the Executive Council of the Society for Clinical and Experimental Hypnosis, 27 Int J of Clinical & Experimental Hypnosis, 452; see, also, authorities cited, supra, n 15.

. See Orne, supra, n 1, at pp 327-334; see, also, Spiegel, Hypnosis and Evidence: Help or Hindrance?, 347 Annals NY Acad Science 73, 79.

. Orne, supra, n 1.

. Conceivably it might be asserted in some instance that, after the hypnosis, the witness recalled details, not mentioned under hypnosis, unrelated to the hypnosis and not previously recollected. The offer of any such testimony should be the subject of pretrial or voir dire hearing, and great care should be taken to assure that any such delayed recall was unaffected by and not a product of the hypnosis.

. By analogy, we observe that hearsay testimony is admissible at pretrial hearings with respect to various issues, e.g., to prove probable cause (CPL 710.60, subd 4; People v Coffey, 12 NY2d 443, 452, cert den 376 US 916).

. See, e.g., Orne, supra, n 30.

. In concept a rough analogy may be suggested to the problems which arise with respect to identification testimony as to independent source and the determination of whether pretrial lineup, showup and other identification procedures have been impermissibly suggestive, and if so the consequences properly to be attached.

. In future cases, of course, the People should give the defendant pretrial notice if they intend to call a witness who they know has been hypnotized some time prior to trial.