◼ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MICHAEL GRAY, Appellant.—Appeal by the defendant from a judgment of the Supreme Court, Kings County (Lombardo, J.), rendered July 16, 1984, convicting him of attempted murder in the first degree (two counts), aggravated assault upon a police officer, robbery in the first degree (two counts) and criminal possession of a weapon in the second degree, upon a jury verdict, and imposing sentence. The appeal brings up for review the denial, after a hearing, of that branch of the defendant's omnibus motion which was to suppress identification testimony.

Ordered that the judgment is affirmed.

According to the trial testimony, on April 10, 1982, the defendant and an accomplice robbed David Gutzman, a self-

described gypsy cab driver, at gunpoint. After relieving Gutzman of cash and jewelry, they directed Gutzman to drive to his home in search of more cash. As they proceeded toward his home Gutzman saw a police patrol car and crashed into it in an attempt to abort the robbery. The defendant and his accomplice ran from the cab and Gutzman yelled to the police that they had just robbed him. Police Officer Michael Maillie gave chase on foot, while Sergeant Edward Forsyth sent out a radio transmission and followed in the patrol car. Maillie observed the defendant and his accomplice emerge from a stairwell and then the defendant fired two shots at him. One shot hit Maillie in the leg causing him to collapse. The defendant jumped over Maillie and ran toward Forsyth firing approximately seven shots at him. Since he had no cover, Forsyth dropped to the ground and the defendant then fired two more shots at him, missing both times.

At the pretrial suppression hearing, it was elicited that, during a hospital emergency room interview immediately following the shooting, Officer Maillie told Detective Raymond Apo that he would be able to identify the perpetrators if he saw them again. He said the shooter was clad in a light colored jacket and that the accomplice wore "all dark" clothing. Apo's questioning was then curtailed as the physicians began to provide medical treatment. The following day, Maillie told Apo that the shooter was a light-skinned black male, 5 feet 10 inches to 6 feet tall, weighing 150 pounds, and 25 to 30 years old. The other assailant was a dark-skinned black male, 6 feet to 6 feet 1 inch tall, weighing 165 pounds, 22 to 26 years old, and larger than the shooter. At that time, the defendant was not a suspect. Maillie viewed thousands of photographs after his release from the hospital, but was never shown a picture of the defendant before he was hypnotized in May 1982 and never identified anyone as the shooter.

Detective John Gaspar, a hypnotic investigator assigned to the Hypnosis Unit since 1981, testified that on May 18, 1982, at approximately 1:00 P.M. Officer Maillie arrived at the hypnosis unit at 1 Police Plaza with Detective Cordero. Gaspar had no information regarding the case prior to that day. Before speaking with Maillie, he was told by Cordero of the time and place of the incident and was informed that a description of the perpetrators was being sought. Cordero did not give Gaspar any information as to the prior descriptions given by Maillie. Cordero left the interview room before Maillie entered and Gaspar spoke alone with Maillie. Maillie initially told Gaspar that there were 2 individuals but that

only 1 had fired upon him. He stated that the shooter was 8 to 10 feet away and was 5 feet 10 inches to 6 feet tall with a slim build and wore a beige suit jacket. Maillie also described the defendant's accomplice.

Following Gaspar's administration of a technique described as "progressive relaxation," Maillie reiterated his previous description of the shooter and added that he had short hair and that he might have had a moustache. Gaspar explained that this interview was recorded as a safeguard and that the interview room was very "sterile" to prevent any suggestiveness. The only information Gaspar had was what was given to him by Maillie prior to the "progressive relaxation" exercise. Additionally the questioning was very neutral and general to prevent any suggestiveness. Maillie affirmed that he was fully conscious during the interview with Gaspar and explained that the hypnotic session enhanced his concentration thus enabling him to recall the moustache and short cropped hair. Other than those two details, Maillie insisted that his memory had not been increased.

The hearing court, noting the danger of suggestibility inherent in hypnosis, found that there were no suggestions made and that the incidents recalled by Maillie were essentially the same as he recalled them prior to the session, the only exception being his recollection of the moustache and the short hair. It concluded that Maillie was fully conscious during the session and that the two additional details came from Maillie's heightened consciousness during the session. The defense counsel excepted to this ruling. However, he did not raise any issue with respect to the propriety of the subsequent lineup and photographic identifications of the defendant made by Gutzman and Maillie.

Initially, we note that the defendant has failed to preserve for appellate review his claim that the court should have conducted a *Wade* hearing to determine the propriety of the lineup identifications. Prior to trial, the defendant moved to dismiss Maillie's lineup identification and in-court identification of the defendant based upon the fact that these identifications were made after Maillie had been hypnotized. At the outset of the suppression hearing, the prosecutor told the court that he was ready to proceed and apprised the court and counsel of the witnesses he was prepared to call to testify on the issue of the claimed suggestibility of the hypnosis. There was no mention of the propriety of the composition of the lineups and, although counsel objected to the court's ruling on the hypnosis identification, he never made any reference to

the composition of the lineups. As such, the defendant has failed to preserve this issue for appellate review *(see, People v Martin,* 50 NY2d 1029; *People v Tutt,* 38 NY2d 1011; *People v Jones,* 81 AD2d 22, 41-42). Likewise unpreserved for appellate review is the defendant's claim that the verdict sheets submitted to the jury were improper since he failed to object to their submission *(see, People v Rodriguez,* 144 AD2d 598; *People v Decambre,* 143 AD2d 927; *People v Battles,* 141 AD2d 748; *People v Williams,* 138 AD2d 430; *People v Monroe,* 135 AD2d 741; *cf., People v Nimmons,* 72 NY2d 830; *People v Testaverde,* 143 AD2d 208).

In *People v Hughes* (59 NY2d 523), the intricacies of the admission of hypnotically induced testimony were addressed. The *Hughes* court noted three dangers inherent in hypnosis: (1) that the subject may become susceptible to suggestions given intentionally or unintentionally by the hypnotist or others during the session, (2) confabulation (the filling in of memory gaps), and (3) an increased confidence in the identification following the procedure. While noting these potential hazards, the court specifically stated that the pretrial use of hypnosis would not necessarily render the witness incompetent to testify to events recalled prior to being hypnotized and also noted the distinction between cases where a suspect is in custody and those where the suspect is unknown *(see also, People v Eybergen,* 130 Misc 2d 1, *affd* 131 AD2d 981).

In *Hughes* it was held that a "case by case" analysis is necessary until procedural standards can be established as to the admissibility of hypnotically induced testimony. At the pretrial stage there must be inquiry and resolution of the extent of the witness's prehypnotic recollection (which would establish the boundaries of admissible testimony) and scrutiny as to whether the hypnosis was so impermissibly suggestive as to require exclusion of in-court testimony with respect to such prehypnotic recollection. The burden is upon the People to establish by clear and convincing proof that the testimony of the witness as to his prehypnotic recollection is reliable and there has been no substantial impairment of the defendant's right of cross examination.

In this case, unlike the situation presented in *Hughes,* the police did not have a suspect and the information sought through the hypnosis was needed to assist the police in locating the perpetrator. Since the undisputed evidence at the hearing was that Maillie was confident in his prehypnotic recollection of the perpetrator and there were no substantial additions or changes in the description following the session,

the People sustained their burden of proving that the prehypnotic identification was reliable. It should be noted that Maillie's direct trial testimony did not mention the hypnosis. It was only on cross-examination that defense counsel elicited the hypnotic session. Therefore it may not be claimed that the People exceeded the bounds set by the hearing court. Further, the dangers of suggestiveness or confabulation were not present as the posthypnotic description did not yield any significant changes in Maillie's account of the incident or in the appearance of the assailant. We also find that the People established through the uncontroverted testimony of Detective Gaspar that the session was conducted in a neutral environment, that the questioning was not suggestive and that the defendant was not denied his right of cross-examination.

In any event, as the lineup was held seven months following the hypnotic procedure, any enhanced confidence would have dissipated over the passage of time and the lineup was sufficiently attenuated from the hypnosis so that testimony regarding Maillie's lineup identification was properly admitted (see, *People v Watts,* 130 AD2d 695). In this regard, it is noteworthy that the only posthypnotic additions to the description were of a possible moustache and short hair. Also, Maillie testified that the defendant's hair was longer at the lineup than at the time of the incident.

As the defendant failed to request a charge on the vagaries of hypnotically induced testimony and voiced no objections to the charge as given, this claim is unpreserved for appellate review. Although where such charge is requested the trial court must acquiesce (see, *People v Tunstall,* 63 NY2d 1, 9-10; *People v Smith,* 63 NY2d 41, 70, *cert denied* 469 US 1227; *People v Hughes,* 59 NY2d 523, 548, *supra),* in the instant case there was no such request. In light of the cursory reference to the hypnotically induced identification testimony brought out on cross-examination to impeach Officer Maillie, such a charge would have been inappropriate and would only have served to cause the jury to accord greater attention to the hypnosis.

We have examined the defendant's claim that the sentence imposed was excessive and find it to be without merit, particularly in view of the violent nature of the crime (*People v Suitte,* 90 AD2d 80). Brown, J. P., Eiber, Kooper and Rosenblatt, JJ., concur.