OPINION OF THE COURT
Norman J. Felig, J.
The defendants herein, James Tunstall and Robert Chamberlin, were convicted, after a jury trial, of rape in the first degree, sodomy in the first degree (two counts), robbery in the second degree and grand larceny in the third degree on Richmond County indictment No. 248/79. Tunstall was sentenced on July 18, 1980 (Di Vernieri, J.), and on the appeal from the ensuing judgment of conviction, the Appellate Division, Second Department, in an order dated October 24, 1983, reversed the judgment and ordered a new trial to be preceded by a pretrial hearing "to determine 'the extent of the [complaining] witness’s prehypnotic recollection * * * and whether the hypnosis was so impermissibly suggestive as to require exclusion of in-court testimony with respect to such prehypnotic recollection’ ” (People v Tunstall, 97 AD2d 523). Leave to appeal to the Court of Appeals was subsequently granted, and, on July 5, 1984, the order of the Appellate Division was modified and the case was remitted to the Supreme Court, Richmond County, for further proceedings in accordance with the underlying opinion by Judge Jasen (People v Tunstall, 63 NY2d 1). The Court of Appeals directed that a hearing be held to determine the effect, if any, that statements made to the victim by the hypnotist, while she was under hypnosis, may have had upon the defendant’s ability to meaningfully cross-examine her. If it is ultimately determined that the ability to do so has been "substantially impaired” by virtue of the hypnotic session, then the court directed that a new trial must be held "at which the testimony of the victim may be limited or excluded entirely depending on the findings” (People v Tunstall, supra, p 9). On the other hand, if the determination is to the contrary, then the jury verdict is to be reinstated and the judgment amended to reflect that determination.
As for the codefendant, Robert Chamberlin, in addition to *642 his conviction with Tunstall on indictment No. 248/79, he had two other criminal matters pending against him in Richmond County, and his sentence was adjourned so that a disposition could be had as to all of his pending cases. Subsequently, Chamberlin pleaded guilty to attempted robbery in the first degree under indictment No. S-287/79, with the understanding that the sentence to be imposed on that conviction would run concurrently with the sentence to be imposed on indictment No. 248/79, and on December 17, 1980, he was sentenced to indeterminate term of imprisonment on indictment No. 248/79. Thereafter, and on January 15, 1981, Chamberlin was sentenced as a second felony offender to a concurrent, indeterminate term of imprisonment on indictment No. S-287/ 79, and on February 26, 1981, he was sentenced to a further indeterminate term of imprisonment as a probation violator on indictment No. 100/77. However, that sentence was designated to run consecutively with the sentence imposed on indictment No. 248/79. A notice of appeal was subsequently filed on behalf of Chamberlin with regard to his conviction on indictment No. 248/79, but apparently nothing was done with respect to perfecting that appeal until after the Appellate Division reversed the conviction of the codefendant, Tunstall, on October 24, 1983. An appellate brief was thereafter filed on Chamberlin’s behalf on March 15, 1984 and a respondent’s brief was filed on or about August 8, 1984. The foregoing appeal was never calendared, however, for following the decision of the Court of Appeals in People v Tunstall (63 NY2d 1, supra), the People moved in the Appellate Division, inter alia, to remand the Chamberlin matter to the Supreme Court for a hearing on the effect, if any, of hypnosis on appellant’s ability to meaningfully cross-examine the female victim at the trial on the underlying indictment. This motion was granted on or about October 10, 1984, whereupon Chamberlin’s appeal was ordered held in abeyance and the matter remanded to the Supreme Court, Richmond County, for the above-mentioned hearing.
In view of the identity of the issues posed thereby, a unitary hearing was held before this court in compliance with the orders of both the Court of Appeals in Tunstall and the Appellate Division in Chamberlin, at which the sole legal question to be determined was whether the complainant’s participation in a pretrial hypnotic session, conducted at the suggestion of the District Attorney, had artificially enhanced her confidence in the certainty of her prehypnotic recollec *643 tions of the incident (e.g., her identification of the defendants) in such a way as to substantially impair the defendant’s ability to meaningfully cross-examine her at the trial. In this regard, the issue to be determined by this court upon remand was framed as follows by the Court of Appeals (People v Tunstall, 63 NY2d 1, 7-9, supra):
"The problems associated with allowing a witness who has previously been hypnotized to testify against a defendant at trial were recently given thorough consideration by this court. (See People v Hughes, 59 NY2d 523.) In that case, we recognized that a witness may be affected in three primary respects as a result of having been hypnotized: (1) he may become susceptible to suggestions given intentionally or unintentionally by the hypnotist or others present during the session; (2) the subject may confabulate or intentionally fabricate incidents in order to fill memory gaps or to please those conducting the hypnotic session; (3) a witness who recalls an event under hypnosis which he had previously recollected may experience an artificially enhanced confidence in his subsequent recollection of that incident, thereby unfairly impairing defendant’s ability to cross-examine that witness. (People v Hughes, supra, at pp 534-535, 546.)
"All three of these problems were at the forefront of our decision in Hughes. In that case, we stated that generally the extent of the witness’s prehypnotic recollections establishes the boundaries of admissible testimony (People v Hughes, supra, at p 546) and affirmed the order of the Appellate Division which granted defendant a new trial because the court denied the defendant’s motion to suppress the evidence obtained during the hypnotic session, and such evidence was introduced at trial.
"By sharp contrast, the defendant in the appeal before us does not vigorously argue that the victim’s testimony at trial contained additional inaccurate facts recalled during or after hypnosis as a result of her allegedly increased susceptibility to external suggestions while under hypnosis or that she fabricated imaginary incidents to fill memory gaps. Indeed, such an argument would clearly fail, for the victim’s testimony at trial virtually mirrored the prehypnotic statements which she gave to the police and the prosecutor. Even defendant does not point to any facts which the victim testified to at trial that she had not mentioned to the police prior to being hypnotized. Consequently, the two areas of concern identified in Hughes *644 with respect to suggestibility, confabulation and fabrication are not at issue here.
"What lies at the heart of this appeal, therefore, is defendant’s assertion that the victim’s confidence in her prehypnotic recollections, such as her identification of defendant, may have been artificially enhanced by the hypnotic process, thereby impairing defense counsel’s ability to conduct a meaningful cross-examination of her. It is precisely this concern which we termed the 'major difficulty’ underlying the use of hypnosis on persons who subsequently testify at trial. (People v Hughes, 59 NY2d 523, at p 546, supra; see, also, Diamond, Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness, 68 Cal L Rev 313, 339-340.) We also noted that the problem may become more serious where, as here, the hypnotist suggests to the subject that a particular event occurred or that the subject will remember everything when she returns to a normal state of consciousness. (People v Hughes, supra, at p 546.) * * *
"To assess the effect, if any, that these and other statements made to the victim while she was under hypnosis may have had on defendant’s ability to meaningfully cross-examine her, a hearing is required. (People v Hughes, supra, at p 546.) * * *
"On the legal issue raised, the prosecutor will have the burden of demonstrating by clear and convincing proof that there has been no substantial impairment of the defendant’s ability to meaningfully cross-examine the victim. (Id., at p 547.)”
Although not unmindful of the fact that some of the more recent trends regarding the forensic use of hypnosis appear to favor a restriction of its utilization to the investigative stages of a criminal proceeding, and even then under the protection of rather specific safeguards (see, e.g., Council Report: Scientific Status of Refreshing Recollection by the Use of Hypnosis, 253 JAMA 1918-1923), it is the court’s determination in accordance with the mandate of the appellate courts in this case, that on the credible evidence adduced at the hearing, the People have sustained their burden of demonstrating by clear and convincing proof that there has been no substantial impairment of the defendants’ ability to meaningfully cross-examine the complainant/victim herein. Naturally, the foregoing is not intended to establish any general precedent regarding the testimonial capacity of persons who have been subjected to hypnosis in connection with an active criminal *645 prosecution (cf. People v Hughes, 59 NY2d 523), and is restricted solely and explicitly to the facts of the instant case.
The underlying facts have been cogently summarized as follows:
"In the early morning hours of May 4, 1979, a rape victim and her boyfriend were talking in his car while parked in front of her home. The couple noticed two men walk by the car once and then again from the opposite direction. Shortly thereafter, the two men returned, wearing ski masks and brandishing a pistol and a shotgun or a rifle. The man with the pistol, later identified by the victim and her boyfriend as defendant James Tunstall, crouched by the curb and aimed the weapon at the victim’s head, while the other man, later identified as Robert Chamberlin, trained his gun on the boyfriend. The men then forced their way into the car, ordered the boyfriend into the back seat and drove away. After the boyfriend was robbed of $40, he was ordered out of the car. The two men then drove the victim to a nearby park where they raped and sodomized her. Afterwards, she was allowed to leave the car and the men drove away.
"At approximately 10:30 a.m. on the same day, the victim reported the crime to the police and described the perpetrators and the details of the attack. The victim and her boyfriend returned to the police station on May 26, 1979 to view photographs of previous offenders. The boyfriend examined the arrays alone and positively identified both [Tunstall] and Chamberlin as the men who accosted him. The victim then independently identified the same two individuals as her attackers. Both men were subsequently arrested and charged with rape, sodomy, robbery and grand larceny. The victim and the boyfriend independently identified Chamberlin and [Tun-stall] once again after viewing them in a series of lineups conducted on June 4, 1979.
"On December 7, 1979, the victim again related the events of May 4 in detail to an Assistant District Attorney. This statement was videotaped. Immediately thereafter, she was hypnotized in an effort to refresh her recollection as to any details of the crimes which she might have forgotten. The only further details elicited, however, were that [Tunstall] was wearing an army jacket and Chamberlin was wearing a plaid flannel shirt. The victim never testified to those details at trial and the People made no attempt to introduce them by other means. ” (People v Tunstall, 63 NY2d 1, 4-5, supra; emphasis supplied.)
*646 As has previously been indicated, both defendants were subsequently convicted and took separate appeals.
In attempting to provide the hearing court with some practical guidelines regarding the nature of the hearing to be conducted in accordance with its wishes, the Court of Appeals set forth seven specific factors which were to be taken into consideration in resolving the question of whether the use of hypnosis had substantially impaired the defendants’ ability to meaningfully cross-examine the alleged victim of the rape. They are:
(1) the amount of confidence that the witness had in her initial recollections prior to being hypnotized;
(2) the extent of her belief in the ability of hypnosis to yield the truth;
(3) the degree to which she was hypnotized;
(4) the length of the hypnotic session;
(5) the type and nature of the questions employed;
(6) the effectiveness of the hypnosis in yielding additional details; and
(7) any other facts which the court may deem important based upon the specific facts and circumstances of this case (People v Tunstall, 63 NY2d 1, 9, supra, citing People v Hughes, 59 NY2d 523, 546, supra). The same factors will be employed with regard to the remand in People v Chamberlin. As a procedural matter, each of these factors will be considered seriatum in line with the relevant evidence adduced at the hearing. The factors will then be evaluated both separately and in combination.
First, the amount of confidence which the victim had in her initial recollections prior to being hypnotized.
Only two witnesses testified at the hearing regarding the confidence which the victim exhibited in her prehypnotic recollections, the victim herself and the principal detective involved in the case, Anthony DeGise. Although the events to which they were testifying were admittedly over six years old, the court is nevertheless of the opinion that their testimony is credible, and, with regard to the victim, substantially free of any posthypnotic taint at this late date.
The victim made her first identification of the defendants on May 26, 1979, 22 days after the crime occurred. She was shown different photo arrays at that time, one of which included a picture of James Tunstall, and the other of which *647 included a picture of Robert Chamberlin. Anthony DeGise, the detective assigned to the case, since retired, testified that both identifications were made by the victim in his presence, and that she selected each defendant within a matter of 10 to 15 seconds. Subsequent to this photographic identification, the victim again identified both defendants in a matter of seconds in four separate corporeal lineups (two of each defendant) on June 4, 1979. DeGise testified that the victim did not express any reservations about either the May 26th photographic identifications or the June 4th corporeal identifications. He testified, in fact, that had she expressed any doubt on the occasion of the first of these corporeal identifications, a second one would not have been conducted.
The victim herself testified that she had a high degree of confidence and certainty in these initial identifications, which she expressed in terms of "absolute” certainty and being "very sure”. Her confidence in both the photographic and corporeal identifications is evidenced by the fact that she unequivocally identified each defendant each time within a matter of seconds. As the results of the pretrial Wade hearings indicated, these prehypnotic identifications were independent of any extrinsic influence. In addition, approximately two months later, on July 30, 1979, the victim appeared before the Grand Jury and reaffirmed her initial identifications, as she did again on December 7, 1979 in her prehypnotic, videotaped interview with the Assistant District Attorney. On each of these occasions, she described her ability to identify the defendants as "clear” and "definite”.
Insofar as this factor is concerned, the defendants appear to be arguing that the hypnotist created an artificial condition during the hypnotic session, causing the victim to believe the lighting conditions at the crime scene were better than they were in fact. Defendants maintain, inter alia, that their ability to meaningfully cross-examine the victim at trial was substantially impaired by this event, since there is no way to ascertain what effect artificially enhancing the lighting conditions had upon her confidence in the identifications at trial (see, People v Tunstall, 63 NY2d 1, 8, supra).
Under different circumstances, such an argument might well prove worthy of merit. However, under the specific circumstances of this case no such problem arises, because, prior to her being hypnotized, the victim on several occasions unequivocally identified the defendants as the perpetrators. She was confident and certain in these identifications from the *648 outset and never wavered. The visual record of the prehypnotic interview reveals this confidence, which is further supported by her testimony at the hearing. These facts should be accorded great weight in determining the amount of confidence which the victim evinced prior to her being hypnotized, and based upon these considerations, the court is satisfied that the victim demonstrated a high degree of confidence in her initial recollections prior to being hypnotized.
Second, the extent of the victim’s belief in the ability of hypnosis to yield the truth.
At the hearing, the victim testified that at the time that she was asked to undergo hypnosis, she believed she was going to be hypnotized in order to develop additional information regarding the case. Though skeptical of hypnosis and its ability to develop such additional data, the witness stated that she subjected herself to the hypnotic session in an effort to cooperate with the police, although she admittedly did not communicate her skepticism to Dr. Arann, who conducted the hypnotic session, the witness testified that she thought that the session was "silly” and a "waste of time”. In addition, she stated that she did not believe the session could, would or did increase her already high confidence in her prior identifications of the defendants. She also stated that she did not believe she could be hypnotized, and, in seeming contradiction to her testimony at the trial, stated that she did not believe that she actually had been hypnotized. According to one of the People’s experts, however, this last phenomenon is not uncommon among hypnotic subjects. In sum, the witness stated that she did not believe that the session would augment her ability to identify the defendants, or that her ability to do so had been changed by the experience. In opposition, the defendants’ experts greatly discounted the reliability or value of the victim’s recollections regarding her prehypnotic attitudes, while one of them, Dr. Aphrodite Clamar, an expert in psychology, psychotherapy and the clinical applications of hypnosis (but not forensic hypnosis), testified that the victim in this case appeared (in the videotapes) to be highly motivated throughout the hypnotic session in the effort to "catch the right men”. Dr. Clamar testified that the risk of confabulation and the extent of residual posthypnotic reinforcement of memory is magnified in such circumstances and poses a serious problem in attempting to evaluate the trial testimony of a witness who has been hypnotized (see, Diamond, Inherent Problems in the Use of Pretrial Hypnosis on a Prospective *649 Witness, 68 Cal L Rev 313, 339-340). On the other hand, one of the People’s experts, Dr. Herbert Spiegel, a well-recognized expert in the field of forensic hypnosis and a prolific author, opined, inter alia, that his review of the videotape and transcript of the hypnotic session revealed the complainant victim to be a reluctant, albeit cooperative, subject, thereby lending credence to the complainant’s testimony regarding her attitude toward hypnosis and minimizing the dangers adverted to by Dr. Clamar.
Under all of the circumstances of this case, it is the court’s conclusion that the complainant’s belief in the ability of hypnosis to reveal the truth was minimal, and that she was not, therefore, overly susceptible to the inherent risks of confabulation, etc., which stem from such belief (cf. People v Hughes, 59 NY2d 523, supra; Diamond, op. cit.).
Third, the degree to which the complainant victim was hypnotized.
The People’s experts, Mr. Harry Arons and Dr. Herbert Spiegel, both of whom are recognized experts in the field of forensic hypnosis with many years of actual experience, and who have written extensively in the area, testified, after reviewing the transcript and videotape of the hypnotic session, that the complainant herein was, at most, only lightly hypnotized, thereby minimizing the danger of enhanced confidence. They stated, inter alia, that during deep hypnosis a subject typically experiences revivification, i.e., an emotional "reliving” of the occurrence; tends to respond simply to questions and speak in the present tense; and exhibits a marked suspension of critical judgment, thereby depriving the subject of his or her ability to analyze or explain events, and rendering him or her subject to suggestion. All of these recognized indicia of deep hypnosis were said to be absent in this case.
Mr. Arons testified, for example, that the victim’s responses to certain questions were atypical of a hypnotized person. When asked, e.g., "was the jacket dark”, the victim responded "not too dark, not too light”, thereby indicating to the expert that she had rejected the suggestion to answer simply and volunteered additional information. In addition, there was no evidence that she had experienced revivification. Instead, she dispassionately recited the events to the hypnotist, often speaking in the past tense. According to Mr. Arons, the record of the hypnotic session also revealed an atypical use of the conscious mind. The victim retained her ability to answer in *650 the negative and to explain her answers, thereby indicating to the expert that a pronounced suspension of critical judgment had not occurred. In sum, the subject could not be said to have been placed into a deep trance.
It appears to this court that the atypical use of the conscious mind and the lack of suspension of critical judgment supports the conclusion of the People’s experts that the complainant, at best, was only lightly hypnotized. Accordingly, as Dr. Spiegel testified, the danger of enhanced confidence, which is associated primarily with deep hypnosis, was minimal. In support of this conclusion, Dr. Spiegel testified that in a test developed by him to measure hypnotic susceptibility (the so-called hypnotic induction process or HIP), the complainant indicated a very low level of hypnotic capacity. Enhanced confidence typically arises in only the top 5 to 10% of the population when viewed according to their susceptibility to hypnosis, and then only during deep hypnosis. The complainant here would be highly unlikely ever to reach such a state.
Dr. Robert Buckhout, the second defense expert and a professor of psychology who specializes in human memory and perception as it may be affected by hypnosis, but who candidly admitted that he is not an expert in forensic hypnosis, conceded that HIP is a recognized test of hypnotic susceptibility, but opined, as did Dr. Clamar, that a test performed in 1986 was not necessarily reflective of the subject’s hypnotic susceptibility in 1979 (Dr. Spiegel had stated that the measurement is relatively static over time). In addition, both defense experts stated that the depth or level of hypnosis was largely irrelevant to the issue of enhanced confidence. Some gains will be made even under light hypnosis. As for the demonstrated existence of critical judgment, both of the defense experts further opined that critical judgment is never fully suspended even under the deepest hypnosis. However, neither defense expert would express an opinion on the degree to which the complainant had been hypnotized.
Acknowledging, as the court must, that the hypnotists’ failure to objectively measure the depth of the complainant’s trance at the time of the hypnosis gives rise to a series of problems pertaining to her susceptibility to hypnotic suggestion, it has nevertheless been concluded from all of the written and visual evidence, as well as the credible expert testimony which has been adduced at the hearing, that the complainant at bar was not subjected to a deep hypnotic trance. Accordingly, the high risk of suggestibility which is character *651 istic of persons who have been placed in a deep hypnotic state is not a factor in this case.
Fourth, the length of the hypnotic session.
All of the experts agreed that the length of the hypnotic session in this case was not out of line with established hypnotic procedures. Accordingly, it is of no special significance in the determination of this matter.
Fifth, the type and nature of questioning employed.
In its recent decision in People v Hughes (59 NY2d 523, supra), the Court of Appeals identified three principal problems associated with the use of pretrial hypnosis upon a prospective witness, (1) that the subject may become susceptible to suggestions given intentionally or unintentionally by the hypnotist or others present during the session; (2) that the subject may confabulate or intentionally fabricate incidents to fill memory gaps or to please those conducting the hypnotic session; and (3) that a witness who recalls an event under hypnosis which he had previously recollected may experience an artificially enhanced confidence in his subsequent recollection of that incident, thereby unfairly impairing the defendants’ ability to cross-examine that witness (see, Diamond, op. cit.). In light of these problems, the court concluded that the extent of a witness’s prehypnotic recollections generally establishes the outside boundaries of admissible trial testimony (see, People v Hughes, supra, p 546).
In this case, it has not been seriously contended by either defendant that the complainant’s testimony at trial contained additional inaccurate facts recalled during the hypnotic process, or that she fabricated incidents in order to fill gaps in her memory. In fact, any such contention would appear destined to failure, as the complainant’s trial testimony substantially mirrors the statements which she made to the police and the District Attorney during prehypnotic interview. What the defendants’ experts do contend, however, is that the risk of suggestibility was great in this case because the complainant was asked leading questions during the hypnotic session. Thus, the defendants maintain, inter alia, that the hypnotist (Dr. Arann) suggested to the complainant that she did get a "good glimpse” of her attackers while they were standing "clearly in the light”, thereby providing the complainant with a better opportunity to "see” her attackers than may, in fact, have been the case. In addition, the defendants point out that at the end of the session the hypnotist told the complainant *652 that she would remember the events which she had recounted while under hypnosis when she returned to a normal conscious state. Defense experts, Drs. Clamar and Buckhout, both opined that such an occurrence generally bolsters the subject’s confidence in the certainty of his or her prehypnotic recollections.
On behalf of the People, Mr. Arons testified that when viewed in its totality, the nature of the hypnotic session to which the complainant was subjected was not unduly suggestive. Although he conceded that the hypnotist, Dr. Arann, at times employed leading questions, Mr. Arons noted that, on those particular occasions, the subject answered in such a way as to reject the potential suggestion. When asked, for example, "was the jacket dark?” the complainant answered "not too dark, not too light”, thereby rejecting any arguable suggestion regarding the color of the jacket. This, he noted, was related to the fact that the witness was not deeply hypnotized, which, in turn, tended to decrease the risk of posthypnotic suggestion. In Arons’ opinion, the use of hypnosis in this case did not artificially enhance the confidence level of the complainant.
Each of the remaining three experts was increasingly more critical of the hypnotic procedures, and concluded, in effect, that they were not in accordance with the most recently promulgated guidelines of the AMA. Dr. Spiegel, however, a member of the committee which fashioned said guidelines, would not go so far as to brand the procedures "irregular”. In fact, while the doctor conceded that the presence of the Assistant District Attorney, the failure of the hypnotist to test for the level of hypnosis, and procedural deviations such as the employment of leading questions, could all have an effect upon a deeply hypnotized subject, he opined that none of the foregoing would be operative here, as the subject in question was not deeply hypnotized and retained her critical judgment throughout the hypnotic session. In support of this position, the doctor noted that while the complainant had apparently been able to recall additional details regarding her attacker’s manner of dress while under hypnosis, she was not able to recall those same details at trial notwithstanding the fact that she had been instructed by the hypnotist that she would be able to recall such details when she returned to a conscious state. This is consistent with his low estimate of the complainant’s hypnotic capability. In sum, it was the opinion of Dr. Spiegel that notwithstanding the conceded defects in the hypnotic procedure, the session conducted in the instant case *653 did not artificially bolster or enhance the complainant’s confidence in the accuracy of her own recollections beyond that which would have occurred in any event from the simple recitation of her experience for an additional time in a conscious state.*
In arguing to the contrary, the defendants’ experts were highly critical of the manner in which the hypnotic session was conducted. In addition, they both expressed agreement with an article by Dr. Bernard L. Diamond in which it was stated, inter alia, that the use of hypnosis to enhance recollection contaminates a subject so as to render him incompetent to testify at trial (see, Diamond, op cit., 68 Cal L Rev, at 332). Dr. Diamond suggests that one feature of hypnosis is its apparent ability to resolve uncertainties and doubts, thereby possibly adding confidence to the subject’s faith in his own recollection (Diamond, op. cit., at 339). The defendants assert that it is these expressions of doubt and other indications of a lack of self-confidence which were not available to the jury in this case when the complainant was cross-examined because of her previous exposure to hypnosis. However, upon a further examination, it appears to this court that the bulk of Dr. Diamond’s article was concerned with the risks associated with the use of hypnosis upon a witness who exhibits uncertainty in his initial recollections. No such circumstance exists in this case, as the complainant was not an uncertain witness. Rather, she was a witness who had unequivocally identified her attackers several times prior to being hypnotized.
While it cannot be denied from the testimony that there may be some risk and uncertainty arising from the use of hypnosis to enhance the recall of a prospective witness, there were many safeguards extant in the case at bar. First, the complainant was certain in her initial identifications of the defendants. Second, the statements made by the complainant at the prehypnotic interview virtually mirror those made by her at the trial. Third, the complainant was not the sole identification witness. In addition, Dr. Spiegel testified that though the experts do not agree on the use of hypnosis upon a potential witness, it is his opinion that the views expressed by Dr. Diamond are extreme. Dr. Spiegel also noted that to his knowledge, Dr. Diamond is not accepted as an expert in the *654 field of forensic hypnosis, and that his knowledge of hypnosis is not dissimilar to that of a layman. His true area of expertise is forensic psychiatry. Mr. Arons testified that he, too, disagrees with Dr. Diamond, and that he does not believe that the use of hypnosis to enhance the memory of a potential witness will result in either doubt resolution or increased confidence in the subject’s power of recall. Notably, Dr. Diamond’s views regarding the disqualification of a witness who has been subjected to hypnosis is not in accordance with the law of the State of New York (see, People v Hughes, 59 NY2d 523, supra).
Reviewing the transcript of the hypnotic session in its entirety, the court concludes that the questions propounded to the complaining witness were not unduly suggestive. Moreover, when an arguably leading question was asked of the complainant, she rejected the suggestion and answered on her own terms. This fact and the testimony regarding the low level of hypnosis to which the complainant was subjected to has led this court to conclude that the nature of the questioning should not become a basis for condemning the session as a whole.
Sixth, the effectiveness of hypnosis in yielding additional details.
The Court of Appeals found that the hypnotic session yielded only two, relatively minor, additional facts, neither of which is particularly significant to the matter before this court. One concerned the color of a jacket worn by one of the defendants (Tunstall) and the other a description of the shirt worn by the other defendant (Chamberlin). Although the evidence presently before this court indicates that the complainant also recollected additional minor details regarding the defendants’ clothing, none of them is critical on the issue of identification, as the victim had already unequivocally identified both of her assailants on two or more occasions. In addition, although her recollection of the details of the defendants’ clothing was more pronounced during hypnosis, she failed to recall any of these facts at trial, other than the fact that the defendants were wearing faded blue jeans. She had previously described the defendants as wearing dungarees. On the other hand, she recollected at trial but not during hypnosis that one of the defendants (Chamberlin) had acne, and that the defendants had made a U-turn after letting her boyfriend out of the car. She had previously testified (before the Grand Jury), and stated during her prehypnotic and hypnotic inter *655 views, that the car had gone straight. In sum, it appears that there was a dearth of important details elicited during hypnosis and recalled at the trial.
Seventh, any other facts which the court may deem important based upon the specific facts and circumstances of this case.
In the court’s opinion, one such factor is the length of time between the hypnotic session and the trial. Arons testified for the prosecution that any possible suggestions which may have been made during the one hypnotic session to which the complainant in this case was subjected would have had no effect upon her testimony at the trial six months later. He further stated that while a suggestion imparted during hypnosis can last anywhere from several minutes to several hours before wearing off, this would only occur in a subject who has been placed into a deep trance, which is not the situation here. Dr. Spiegel agreed, opining that the passage of time would diminish the effect of any artificially induced certainty even where the subject is highly susceptible to hypnosis, which the complainant is not.
Dr. Clamar disagreed, and stated that the supplemental information developed during a hypnotic session could last for weeks, months, or even a year depending upon the amount of reinforcement which those recollections receive, e.g., by additional, posthypnotic questioning. Here, however, we have already seen that the complainant was unable to recall at trial the additional information developed during hypnosis. Moreover, there is no indication of any pretrial, posthypnotic interrogation.
Another factor which the court finds material to consider is the number of sessions to which a witness has been subjected. Here, it is undisputed that the complainant was subjected to only one hypnotic session. Mr. Arons, the only witness to testify on the subject, indicated that one hypnotic session will not increase a subject’s confidence in his or her recollection any more than repeating the story to the police. He indicated that several sessions would be required in order to firmly plant a suggestion in the subject’s mind and to heighten the level of confidence in his or her recollection. In his opinion, artificially enhancing a subject’s level of confidence would require a deeply hypnotized subject, plus a specific instruction to the effect that upon returning to consciousness the subject would remember everything that was discussed under hypno *656 sis and believe it to be true. There was no such instruction given in the case at bar.
A final factor which the court must consider in a case such as this is the relative qualifications of the experts who testified at the hearing. In assessing the weight, if any, to be accorded to these opinions, the court has looked closely at the qualifications of the respective experts. Harry Arons, who testified for the People, has worked extensively in the field of hypnosis for over 50 years, has written articles on the subject of forensic hypnosis and has hypnotized thousands of subjects, many of them in connection with criminal investigations. He has been recognized in the courts of New York State as an expert in forensic hypnosis. Somewhat similarly, Dr. Herbert Spiegel, a practicing psychiatrist, is a member of the faculty at Columbia University’s School of Medicine, has written more than 50 articles in the field of hypnosis, and was a member of the AMA panel which issued the 1985 council report relied on so heavily by the defendants’ experts, especially Dr. Clamar. He, too, is a recognized expert in the field of forensic hypnosis, and was conceded to be such by the defendants’ own experts. Both Dr. Spiegel and Mr. Arons stated unequivocally that, under the facts of the instant case, it was their opinion that the single hypnotic session to which the complainant was subjected had no effect upon her at the time of trial, and did nothing whatsoever to enhance her level of confidence in her recollections. In short, it did not affect her testimony at trial.
By way of contrast, the experts proffered by the defense appear to be significantly less experienced in the field of forensic hypnosis. Dr. Clamar, for example, has been practicing full time for only 10 years, is not licensed to practice psychology in New York, and has devoted the bulk of her time involving the use of hypnosis to patients desiring to lose weight or to stop smoking. Although she appears familiar with the literature, she has neither written about nor conducted any research in the field of forensic hypnosis. As for Dr. Buckhout, he is a professor of psychology at Brooklyn College, and has significant experimental experience in the effects of hypnosis upon memory and perception. Although he has an excellent background, he effectively conceded that he possesses no particular expertise in the field of "forensic” hypnosis. In addition, unlike the People’s experts, the defendants’ experts were far more tentative on the question of the effect of hypnosis upon the complainant’s trial testimony. Dr. Clamar, for example, opined that her recollections would be *657 reinforced by the hypnosis, but that the risk of enhanced confidence and its effect upon her trial testimony could not be quantified, especially where she had already related the same story approximately five times before. Dr. Buckhout testified that it could not be said, with any degree of certainty, that the use of hypnosis in this case either did or did not produce any untoward effect upon the character of the complainant’s trial testimony.
CONCLUSION
Upon all of the evidence adduced in this case, it is the court’s opinion that the lack of hesitancy on the part of the complainant during the photographic and corporeal identifications of the defendants, as well as the certainty of her testimony before the Grand Jury and during her prehypnotic interview, all combine to convince this court that she exhibited a high degree of confidence in her recollections of the incident well prior to her exposure to hypnosis. In addition, it does not appear that she either possessed or exhibited any great degree of belief or confidence in the ability of hypnosis to enhance her recollection or to yield the truth. As for the degree to which she was hypnotized and the length of the hypnotic session, it is the court’s belief that weight of the credible expert and other evidence preponderates greatly in favor of the conclusion that she was only lightly hypnotized, and that the length of this particular hypnotic session is not an important factor in the matter before the court.
Turning to the type and nature of the questioning employed, it is the court’s conclusion, based on the expert testimony, that the questions posed to the complainant were not unduly suggestive when viewed as a whole, and that the leading nature of some of the questions was rejected by the complainant in her answers. Accordingly, the undesirable effects which can result from such a situation did not happen here. Moreover, all of the evidence indicates that the use of hypnosis was not particularly effective in yielding significant additional information, and that whatever information it did produce was not repeated at trial. In this regard, it is important to note that on numerous occasions throughout the trial the victim was unable to recall specific factual details. Accordingly, the expressions of fear regarding the artificial enhancement of the confidence of the witness apparently did not materialize.
*658 These factors, plus the fact that there was only one session, of unexceptional length, conducted six months prior to the date of her trial testimony, convinces this court that any untoward effects which may have resulted from the use of hypnosis would already have waned, and would not have persisted to the time of trial. In short, the court is convinced that the prosecution has met its burden of demonstrating, by clear and convincing evidence, that there was no substantial impairment of the defendants’ ability to meaningfully cross-examine the complaining witness due to her exposure to hypnosis, and that her prehypnotic recollections were not artificially enhanced by virtue of the one hypnotic session in which she participated. While the court has so concluded, based upon the nature of the evidence herein, the foregoing is not intended to establish any particular precedent or to signal the court’s approval of the introduction of such testimony in any other case.
As a result of these findings, and in accordance with the mandates of the respective appellate courts, the judgment of the Supreme Court, Richmond County, entered July 18, 1980, convicting the defendant, James Tunstall, inter alia, of rape in the first degree, upon a jury verdict, is hereby reinstated and the judgment is amended to reflect the determination herein. In People v Chamberlin, the judgment of the Supreme Court, Richmond County, entered December 17, 1980, is hereby amended to reflect the results of this hearing.
The foregoing shall constitute the decision and order of this court.
The court acknowledges the assistance of Dawn Varcelona, a summer intern and a second-year student at Syracuse Law School.

 With regard to the observed defects in the hypnotic procedure, it should, perhaps, be noted that the session in question took place in 1979 and that the AMA guidelines referred to by the witnesses were promulgated six years later in 1985.