OPINION OF THE COURT
Alexander, J.
Defendant appeals his conviction, by jury verdict, of second degree murder (Penal Law § 125.25 [1]) and fourth degree criminal possession of a weapon (Penal Law § 265.01). He contends that his statement made during a psychiatric examination pursuant to CPL 330.20 (11) in which he confessed to the murder, had been hypnotically induced and thus was improperly received in evidence against him. Specifically, relying on our decision in People v Hughes (59 NY2d 523), he argues that the statement was inherently unreliable because it was the product of hypnotic therapy and thus was hypnotically induced. He contends that our decision in Hughes established the rule that all hypnotically induced testimony is per *735 se inadmissible. He argues further that because the unwarned statement (see, Miranda v Arizona, 384 US 436) was elicited during a compelled psychiatric examination, its use for a purpose beyond that intended in connection with the examination was grossly unfair and improper.
Defendant asks that we reverse the Appellate Division’s affirmance of his conviction, vacate that conviction and dismiss the indictment because without the challenged statement, the evidence was legally insufficient to sustain his conviction. The People argue that the "findings” of the courts below that defendant’s statement was not the product of hypnosis is not reviewable by this Court and that in any event, none of the reasons for precluding the introduction of hypnotically induced recollection articulated in Hughes are present here, thus Hughes is inapplicable. Therefore, they contend, the statement made by defendant during his psychiatric examination was properly admitted against him. We disagree and now reverse.
I
In September 1979, the body of one Jamie Amsterdamer was found in an alley in Jackson Heights, Queens County. An "angle-iron” pipe, the instrument apparently used in causing Amsterdamer’s death, was found nearby. The ensuing police investigation determined that on the previous night the deceased was seen in two bars accompanied by defendant. Defendant told the investigating detective during an interview at the local police station that he had left the "Betsy Ross” bar with decedent in the early hours of the day on which the body was found, but that they had then traveled separate ways. Although initially questioned in respect to the Amsterdamer death, defendant was not considered a suspect, nor was he charged.
The following year, defendant was arrested and charged with attempted murder in an unrelated homicide. At his trial in 1981, he was found not responsible by reason of mental disease or defect and was committed to Mid-Hudson Psychiatric Center (Mid-Hudson) where he underwent hypnotic therapy. In March 1986, application was made, pursuant to CPL 330.20 (11), to transfer defendant to a nonsecure facility, it being the medical consensus of the doctors at Mid-Hudson that he no longer had a dangerous mental disorder. The District Attorney of Queens County was notified of the appli *736 cation and obtained a court order authorizing an examination of defendant by a psychiatrist nominated by that office.
Dr. Lawrence Siegel was designated to conduct the examination, and he did so with the consent of an attorney of the Mental Hygiene Legal Service, the agency responsible for the provision of legal services to persons such as defendant (see, Mental Hygiene Law art 47). Notwithstanding that Dr. Siegel had advised him that their conversation could not be kept confidential and that a report based on the interview would be forwarded to the District Attorney, during the course of the examination defendant recounted that some three years previously following a self-hypnotic episode, he had "remembered that” he had caused Jamie Amsterdamer’s death in 1979 by striking him in the head with a steel fence post. Dr. Siegel again advised defendant that this information was not confidential and that it would be reported to the District Attorney. Defendant was thereafter arrested and indicted for the murder of Jamie Amsterdamer.
Prior to trial, defendant sought to suppress the statements made to the investigating detective in 1979 and the statements made to Dr. Siegel during the psychiatric examination. Following a Huntley hearing (People v Huntley, 21 NY2d 659) the court denied the motion, concluding that defendant was not "in custody” when being interviewed by the detective in 1979 and therefore was not entitled to Miranda warnings, and further, that the examination by Dr. Siegel was ancillary to a civil proceeding, not involving any past or pending criminal matter in respect to which Miranda warnings were required to be given.[1] Defendant also sought in limine to suppress the statements made to Dr. Siegel on the ground that they were the . product of posthypnotic suggestion. A hearing on this motion was ordered by the trial court.
At the hearing, Emmy Stanley, a Mid-Hudson psychologist who served as defendant’s therapist between 1981 and 1983, testified that when defendant first arrived at Mid-Hudson he did not recall having killed anyone. During their therapy sessions Stanley and defendant explored things that were bothering him, including events that took place during his *737 childhood. Defendant told Stanley that he “wanted to get rid of anything that might come up in the future so that when and if he was ever released to the community, he would have everything behind him.” He also mentioned that he had been troubled by an incident that occurred in an alley. Although Stanley did not know the details of the Amsterdamer killing, defendant had told her previously that he had been questioned about the murder before coming to Mid-Hudson. He told her, however, that he thought he hadn’t committed the murder. Stanley testified that in response to defendant’s statement, she said, “You know Rick, I think you probably did.”
Stanley subsequently received permission to hypnotize defendant and hypnotized him every few weeks. The hypnotic sessions initially addressed defendant’s smoking problem, but Stanley also hoped to relieve defendant of his feelings of guilt and repression. She eventually taught him self-hypnosis and encouraged him to use self-hypnosis, presumably to aid in ridding himself of his feelings of guilt. She told him, “when he was ready to deal with the events of whatever night it was, he would begin to remember them.” Shortly thereafter, while under self-hypnosis, defendant "recalled” the murder of Jamie Amsterdamer. He later told Stanley about the Amsterdamer killing. Stanley testified that although defendant was not under hypnosis when he told her of these events, his statement resulted from the "therapy or post-hypnotic suggestion.”
Defendant’s expert psychologist, Dr. Stanley Fischer, who had an “interest in hypnotic recall”, had taught courses in hypnosis at Columbia University College of Physicians and Surgeons, and had published articles on hypnosis, concluded, on the basis of his examination of a tape of a hypnotic therapy session conducted by Emmy Stanley, and others, with defendant, that there was a “high probability of confabulation.” He explained "confabulation” as being a process by which a person under hypnotic therapy creates material to fulfill a demand of the hypnotist in order to please her. He observed that in the session he reviewed the hypnotist emphasized demands for defendant to produce details, which is exactly the structure that leads to confabulation. He noted, however, that a person would not be "confabulating” if their account of the incident were true and the information recounted was not available from any other source.
The hearing court denied the in limine motion, concluding that there was no proof “that anybody implanted anything *738 into defendant’s mind about the particular acts involving [the] homicide.” Defendant’s subsequent conviction was affirmed by the Appellate Division (159 AD2d 737). That court held that the hearing court properly determined that defendant’s statements regarding the Amsterdamer homicide "were not the product of hypnotic suggestion or confabulation.” (Id,., at 738.) For the reasons that follow, we now reverse the order of the Appellate Division.
II
A
At the outset, we reject the People’s contention that there is a factual finding that defendant’s statement was not the product of hypnosis, which is beyond our power of review. Although this Court is not empowered to review questions of fact, we may examine the legal sufficiency of the evidence purporting to support that determination (see, People v Cosme, 48 NY2d 286, 292; People v Jackson, 36 NY2d 922). Whether evidence is legally sufficient to sustain the findings of a trial court concerning the admissibility of a confession presents a question of law for this Court’s review (see, People v Leonti, 18 NY2d 384, cert denied 389 US 1007; NY Const, art VI, § 3 [a]; Cohen and Karger, Powers of the New York Court of Appeals § 198, at 744-745 [rev ed]). Thus, we may determine whether this record contains any evidence sufficient to support the conclusion that defendant’s confession was "not the product of hypnotic suggestion or confabulation.”
B
In People v Hughes (59 NY2d 523, supra), although we recognized the utility and the benefits of hypnosis as an investigative tool, we concluded that because hypnosis had not been generally accepted in the scientific community as reliable (id., at 543), hypnotically induced testimony was inadmissible as direct evidence. In People v Hults (76 NY2d 190) we extended the Hughes rule to bar the defendant’s use of statements made under hypnosis for cross-examination purposes because the probative value of the hypnotic statement is directly related to its reliability and the dangers inherent therein relate to all hypnotic statements (People v Hults, supra, at 197). Hypnotically refreshed recollections are deemed unreliable because hypnosis "affects the subject in at *739 least three ways: (1) the subject may be susceptible to suggestions given intentionally or unintentionally by the hypnotist or others present during the session; (2) the subject may confabulate or intentionally fabricate events in order to fill in memory gaps; and (3) a witness who has been hypnotized may experience an enhanced confidence in his or her memory of an incident, thereby unfairly impairing a defendant’s ability to cross-examine the witness about the event” (People v Hults, 76 NY2d 190, 197, supra; see also, People v Hughes, supra, at 534-535; People v Tunstall, 63 NY2d 1, 7).
We rejected the approaches used in some jurisdictions in determining the admissibility of hypnotically induced recollections (see, e.g., Harding v State, 5 Md App 230, 246 A2d 302, cert denied 395 US 949 [use of hypnosis affects weight of testimony, not its admissibility]; State v Armstrong, 110 Wis 2d 555, 329 NW2d 386 [case-by-case determination of the suggestibility and reliability of the recall under the totality of the circumstances]; State v Hurd, 86 NJ 525, 432 A2d 86 [holding hypnotically refreshed recollections admissible where prescribed series of standards and safeguards are observed by those administering the hypnosis]; People v Hughes, supra, at 538-540) and instead, adopted the test of Frye v United States (293 F 1013). Employing that test, we concluded that hypnotically induced recall was not admissible since hypnosis had not yet gained general acceptance in the scientific community as a reliable means of restoring recollections. We noted that "it has been scientifically demonstrated that [hypnosis] produces recollections which may contain a mixture of accurate recall, fantasy or pure fabrication in unknown quantities” (People v Hughes, supra, at 543) and that there is no scientifically accepted method for determining whether the subject himself has fabricated or confabulated the events recalled under hypnosis (id., at 539).[2]
The People contend here, however, that defendant’s statement was not hypnotically induced because he was not under hypnosis when he related to Emmy Stanley his recollections of the events in the alley. They argue that because neither Emmy Stanley nor Dr. Siegel knew anything about the Amsterdamer homicide, there could not have been any *740 suggestiveness in their conversations with defendant. They rely upon the hearing court’s conclusion that there was no proof "that anybody implanted anything into defendant’s mind about the particular acts involving [the] homicide.” Contrary to this contention, the record supports no other inference than that defendant’s statement was hypnotically induced. The evidence was that he initially thought he hadn’t committed the Amsterdamer murder about which he had been questioned and that he "remembered” his involvement following an episode of self-hypnosis. The conclusion is thus inescapable that his recollection was the result of hypnotic therapy and posthypnotic suggestion. Because such recollections are inherently unreliable, the defendant’s statement should not have been admitted in evidence against him.
In view of this conclusion, we need not consider defendant’s alternative argument that the statement should have been excluded because it was made without benefit of Miranda warnings and was utilized for a purpose other than a CPL 330.20 (11) transfer determination.
Accordingly, the order of the Appellate Division should be reversed, the confession suppressed and the case remitted to Supreme Court, Queens County, for a new trial should the People be so advised.
Chief Judge Wachtler and Judges Simons, Kaye, Titone, Hancock, Jr., and Bellacosa concur.
Order reversed and case remitted to Supreme Court, Queens County, for further proceedings in accordance with the opinion herein.

. Defendant does not contest the suppression ruling respecting the statement to the investigating detective. He argues, however, that the statements made to Dr. Siegel were pursuant to a "compulsory psychiatric examination”, were "unwarned” and therefore should not have been used against him.

. Although a witness’s prehypnotic recollection may be admissible if it is established, pretrial, that the hypnotic process has not been so impermissibly suggestive as to taint that recollection (see, People v Tunstall, 63 NY2d 1; People v Hughes, 59 NY2d 523, 546), there is no claim here that defendant had any prehypnotic recollection of the Amsterdamer killing.