George McGLAUFLIN, Appellant,

v.

STATE of Alaska, Appellee.

No. A–4356.

Court of Appeals of Alaska.

Aug. 6, 1993.

James H. McComas, Schleuss & McComas, Anchorage, for appellant.

Kenneth M. Rosenstein, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

### OPINION

MANNHEIMER, Judge.

Following a bench trial in the Fairbanks superior court, George "Biff" McGlauflin was convicted of several counts of first-degree sexual abuse of a minor, AS 11.41.-440(a)(2), and first-degree sexual assault under former AS 11.41.410(a)(3) (the older statutory provision covering consensual acts of intercourse with children under the age of 16). McGlauflin appeals. We reverse McGlauflin's convictions because we conclude that he never validly waived his right to jury trial. We also rule that the girl whom McGlauflin allegedly abused can testify at his trial even though she was hypnotized before the incidents of abuse were reported to the authorities.

### McGlauflin's Purported Waiver of Jury Trial

McGlauflin was indicted on September 25, 1991. On November 29, with McGlauflin's trial scheduled to commence the following week, the superior court held a status conference in McGlauflin's case. McGlauflin attended this status conference, sitting in the back of the courtroom.

At the conference, the following exchange took place:

> DEFENSE COUNSEL: It looks like [the] McGlauflin [case] is going to go to trial. Depending upon the State's pref-

erence, Mr. McGlauflin is willing to waive jury.

THE COURT: Monday? Any problems with going [to trial] on Monday?

PROSECUTOR: The only problem ... with the [date], Your Honor, [is that] we have to bring witnesses from California, and trying to arrange ... for witnesses from California to be here on Monday may be a problem.

THE COURT: You're willing to waive jury?

PROSECUTOR: Yes.

THE COURT: Okay. Mr. McGlauflin, are you also willing to waive the jury?

McGLAUFLIN: (no audible response)

THE COURT: Yes? Mr. McGlauflin [is] nodding in the back of the courtroom. It looks like everything is resolving so that we could go on Tuesday, if that isn't a problem.

The record does not contain a written jury waiver or any further discussion concerning McGlauflin's waiver of his right to trial by jury.

■ McGlauflin contends that the trial court violated Alaska Criminal Rule 23(a) by not requiring McGlauflin to execute a written waiver of his right to trial by jury. Criminal Rule 23(a) is explicit on this point:

**Trial by Jury.** Cases required to be tried by jury shall be so tried unless the defendant waives a jury trial in writing with the approval of the court and the consent of the state.

Yet even though Rule 23(a) calls upon the superior court to obtain a written waiver of a defendant's right to jury trial, we do not believe that this omission, of itself, requires reversal of McGlauflin's convictions. Criminal Rule 23(b) likewise calls upon the superior court to obtain a defendant's written consent to proceed with a jury of less than 12, but the supreme court has held that the rule's requirement of a writing is simply an evidentiary preference, a device "to provide the best ... evidence of the express consent of the defendant". A defendant's otherwise valid consent will not be thrown out simply because it was oral rather than written. *Walker v. State*, 578 P.2d 1388, 1390 (Alaska 1978). We interpret the sibling provision, Rule 23(a), in the same manner: even though the rule requires a written waiver of the right to jury trial, we will not nullify an otherwise valid waiver simply because it was oral.

■ However, *Walker* also stands for another proposition: that a defendant's pre-trial waiver of jury trial must be personal, knowing, and voluntary.

We believe that waiver of the right to trial by a jury of twelve persons requires that the court personally address the defendant, and that failure to do so is error per se.... "Not only must the right of the accused to [jury trial] be jealously preserved, but the maintenance of the jury as a fact-finding body in criminal cases is of such importance and has such a place in our traditions, that, before any waiver can become effective, the consent of government counsel and the sanction of the court must be had, *in addition to the express and intelligent consent of the defendant."*

*Walker*, 578 P.2d at 1389–1390, quoting *Patton v. United States*, 281 U.S. 276, 312, 50 S.Ct. 253, 263, 74 L.Ed. 854 (1930) (emphasis added).

In *Walker*, the defendant's attorney apprised the superior court that the defendant wished to be tried by a jury of 6 rather than a jury of 12. The defendant, who was present and heard his attorney's representation, said nothing. The supreme court reversed the resulting conviction, holding that the defense attorney's assertion, "even when coupled with the inference of acquiescence drawn from [the] defendant's failure to protest", was "insufficient to show that the defendant's consent ... was given with the requisite degree of understanding." *Id.* at 1390.

Subsequently, in *Walunga v. State*, 630 P.2d 527 (Alaska 1981), the supreme court elaborated on the requirement of a knowing and voluntary waiver:

Alaska Criminal Rule 23(a) requires that a defendant's waiver of the right to jury trial be in writing, but it does not on its face require the trial judge to make an

inquiry into the circumstances surrounding the ... waiver. In *Walker v. State,* ... however, we stated that the rule does require a personal inquiry by the court to determine whether the defendant's waiver is voluntary and knowing.

*Walunga,* 630 P.2d at 528. In footnote 6 of its opinion in *Walunga,* the supreme court quoted an inquiry that it found adequate:

> THE COURT: [The] record will reflect that the waiver of jury trial has been filed. Let me ask you, Mr. Walunga, ... do you realize that, when you sign this, ... you [will] not have a jury—that I [will] decide the case?
>
> MR. WALUNGA: Yes.
>
> THE COURT: Is that what you want?
>
> MR. WALUNGA: Well, at this time, I suppose, I do not know.
>
> THE COURT: Well, do you understand what you are doing when you sign the waiver of jury trial?
>
> MR. WALUNGA: Yeah.
>
> THE COURT: You know [that] you—[your attorney has] told you [that] you have a right to a jury trial?
>
> MR. WALUNGA: Yes, I realize that.
>
> THE COURT: Okay. All right. [The waiver] will be filed.

This excerpt from *Walunga* differs significantly from the record in McGlauflin's case. While the superior court did address McGlauflin personally, the court's inquiry was cursory ("Mr. McGlauflin, are you ... willing to waive the jury?"). More important, the court did not seek to determine whether McGlauflin understood the right he was relinquishing or the consequences of his choice (that his guilt or innocence would now be determined solely by the judge).

■ It may seem natural to assume that a defendant would make a decision of this importance only after consulting with defense counsel, and that any competent defense attorney would carefully explain the right to jury trial and the reasons why,

in a particular case, it might further the defendant's interests to waive this right.[1] Nevertheless, *Walker* and *Walunga* clearly stand for the rule that a defendant's waiver of jury trial cannot be upheld upon such an assumption; instead, the record must explicitly demonstrate that the defendant understood and personally relinquished the right to trial by jury. The record in this case does not demonstrate McGlauflin's knowing and voluntary waiver of his right to jury trial. Accordingly, we must reverse McGlauflin's convictions.

### *A.C.'s Hypnosis and the Admissibility of Her Trial Testimony*

Although we are reversing McGlauflin's convictions, we must address an evidentiary issue that arose during McGlauflin's trial and would doubtless arise again on retrial. The charges against McGlauflin are based on allegations that he sexually abused a young girl, A.C. During McGlauflin's trial, the parties became aware that A.C.'s mother had had A.C. hypnotized for therapeutic reasons before the sexual abuse was reported to the authorities. This revelation prompted McGlauflin's attorney to ask the superior court to strike A.C.'s trial testimony. The court held a hearing to determine the facts surrounding A.C.'s hypnosis. After those facts had been ascertained, the superior court ruled that A.C. would be permitted to testify.

On appeal, McGlauflin contends that the superior court's ruling violates *Contreras v. State,* 718 P.2d 129 (Alaska 1986), in which the supreme court established rules limiting the admission of testimony of witnesses who have previously been hypnotized. To decide McGlauflin's claim, we must first discuss the *Contreras* decision and then recapitulate the proceedings at McGlauflin's trial.

### a. The *Contreras* Decision

"When a witness is hypnotized by the police in an effort to identify a suspect, is

---

**1.** See Rule 1.2(a) of the newly promulgated Alaska Rules of Professional Conduct, which requires a defense attorney "to abide by the [defendant's] decision, after consultation with the lawyer, ... whether to waive jury trial".

the witness' subsequent testimony at trial, as to facts and recollections adduced during hypnosis, admissible evidence?" This first sentence of the *Contreras* opinion, 718 P.2d at 129, states the issue presented to the supreme court in that case.

Joseph Contreras was indicted on charges of kidnapping and sexual assault. 718 P.2d at 130.[2] Before Contreras had been identified as the perpetrator of these crimes, a police officer hypnotized one of the victims, S.J., in an effort to gain further information that would help the police identify a suspect. Following the hypnosis session, S.J. identified Contreras as her assailant. *Id.* Contreras asked the superior court, and later the supreme court, to bar S.J. from testifying at his trial; he asserted that S.J.'s hypnosis had irreparably tainted her memory and that her testimony was therefore too untrustworthy to be admitted in court. *Id.*

The supreme court, after reviewing the scientific literature as well as court decisions from other states discussing the use of hypnosis as a forensic tool, concluded that there were three fundamental problems with admitting "hypnotically induced statements or recollections":

[T]he three affected areas [are]: first, that a person who has been hypnotized becomes increasingly susceptible to suggestions consciously or unconsciously advanced by the hypnotist or others present during the session; second, that the subject himself may confabulate [i.e., unconsciously invent details to fill gaps in the subject's pre-hypnosis memory]; and third, that the subject will experience an increased confidence in his subsequent recollection of the incident in question.

*Contreras*, 718 P.2d at 131–32 (footnotes omitted).

Expanding upon these three potential dangers of trying to retrieve memory by the use of hypnosis, the supreme court quoted with "full agreement" the discussion of the North Carolina Supreme Court in *State v. Peoples*, 311 N.C. 515, 319 S.E.2d 177, 181–82 (1984):

[S]uggestions can be entirely unintended and even unperceived by the hypnotist as well as the subject. Likewise, the subject experiences an overwhelming desire to please the hypnotist and, hence, becomes even more susceptible to suggestion. The subject may unwittingly produce responses which he perceives to be expected [by the hypnotist]. Since a subject under hypnosis undergoes an impair[ment of] critical judgment, he may give undue credence to vague and fragmentary memories upon which he would not have relied outside the hypnotic state. A combination of a susceptibility to suggestion and a compelling desire to please the hypnotist causes the subject to experience an unwillingness to admit that he cannot recall certain events. Thus he becomes susceptible to creating the event.

... [T]he dangers surrounding hypnotically refreshed testimony become even more pronounced when we realize that it is virtually impossible for the subject or even the trained, professional hypnotist to distinguish between true memory and pseudo memory.... Absent objective, independent means to verify [the subject's] recall, its accuracy must remain both unknown and unknowable.

In addition to resulting in this inability to distinguish between actual and created memory, the process of hypnosis tends to enhance the subject's confidence in his memory, whether genuine or invented.... After a subject experiences what he believes to be a recall of events under hypnosis, he may develop an unshakable subjective conviction and confidence in his refreshed recollection....

In short, hypnosis not only irrevocably masks whether a subject's recall ... is true, it also creates a barrier to the ascertainment of [the memory's] truthfulness through cross-examination—[the] method normally relied on in the court-

---

**2.** Contreras was ultimately convicted of these crimes. *Contreras v. State,* 767 P.2d 1169 (Alaska App.1989).

room to test the truthfulness of testimony.

*Contreras,* 718 P.2d at 133.

Based upon these scientifically recognized dangers of trying to enhance or reconstruct a witness's memory through hypnosis, the supreme court ruled that the use of hypnosis as a method of refreshing a witness's memory fails the *Frye* test[3]: there is "[in]sufficient [scientific] consensus on the reliability of hypnotically aided recall". 718 P.2d at 135–36. These same dangers led the supreme court to hold that hypnotically adduced testimony is uniformly more prejudicial than probative and thus must be excluded under Evidence Rule 403. *Id.* at 136–38.

Having concluded that hypnotically enhanced memory is too untrustworthy to be admitted in court, the supreme court next faced the question of whether to accept Contreras's argument that a previously hypnotized witness should be completely barred from testifying. The problems of suggestion and confabulation were solved by restricting the witness's testimony to the facts he or she demonstrably recalled before hypnosis. Contreras argued, however, that because hypnosis can potentially increase witnesses' subjective certainty of the accuracy of their memory, the experience of hypnosis "may irreparably alter[ ]" a witness's sincerity, thus abridging a defendant's confrontation rights by making it "impossible to effectively cross-examine a previously hypnotized witness". 718 P.2d at 138.

The supreme court recognized this potential danger of hypnosis and concluded that "defendants are deprived of their constitutional right of confrontation under the Alaska Constitution when *hypnotically adduced evidence* is introduced". 718 P.2d at 139 (emphasis added). Nevertheless, the supreme court refused to bar all testimony of previously hypnotized witnesses. Despite the possibility that a previously hypnotized witness might display an increased level of confidence in all of his or her memories (not just the ones retrieved through hypnosis), the court ruled that "[a] person who has been hypnotized may testify as to facts which he related before the hypnotic session". *Contreras,* 718 P.2d at 139.

Decisions from other states show that *Contreras* is the favored rule in the United States. Only one state court, the California Supreme Court, has adopted Contreras's argument that previously hypnotized witnesses should be completely barred from testifying because of their potentially increased level of subjective certainty. *People v. Shirley,* 31 Cal.3d 18, 181 Cal. Rptr. 243, 272–73, 723 P.2d 1354, 1383–84 (1982), *cert. denied,* 459 U.S. 860, 103 S.Ct. 133, 74 L.Ed.2d 114 (1982).[4] Other states have acknowledged the problem of a witness's potentially increased level of subjective confidence in pre-hypnosis memories, but all these states nevertheless take the position that a witness can testify about facts that the witness demonstrably recalled before hypnosis. *State ex rel. Collins v. Superior Court* (on rehearing), 132 Ariz. 193, 209–10, 644 P.2d 1279, 1295–96 (Ariz.1982); *Elliotte v. State,* 515 A.2d 677, 679–681 (Del.1986); *Commonwealth v. Kater,* 388 Mass. 519, 447 N.E.2d 1190, 1197–98 (1983); *People v. Nixon,* 421 Mich. 79, 364 N.W.2d 593, 598–99 (1984). The words of the New York Court of Appeals are often quoted:

> [W]e note our agreement with those courts which have concluded that the pretrial use of hypnosis does not necessarily render the witness incompetent to

---

**3.** *Frye v. United States,* 293 F. 1013 (D.C.Cir. 1923), adopted by the Alaska Supreme Court in *Pulakis v. State,* 476 P.2d 474, 478 (Alaska 1970). But see *Daubert v. Merrel Dow Pharmaceuticals, Inc.,* —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), in which a unanimous Supreme Court declared that the Federal Rules of Evidence have superseded *Frye.*

**4.** The California legislature has altered the result in *Shirley.* California Evidence Code § 795 allows a previously hypnotized witness to testify if: (1) the witness's testimony is confined to facts that the witness demonstrably recalled before being hypnotized, (2) the hypnosis session was conducted with certain safeguards, and (3) the totality of circumstances indicates that the witness's testimony is reliable.

testify to events recalled prior to being hypnotized.

[H]ypnosis has proven to be a useful and apparently essential investigative tool for generating leads in cases where normal police procedures have proven inadequate.... It also appears that hypnosis has become a fairly standard course of medical treatment for amnesia resulting from traumatic events, including witnessing or being victimized by a criminal act. A criminal trial for rape or assault would present an odd spectacle if the victim was barred from saying anything, including the fact that the crime occurred, simply because he or she submitted to hypnosis sometime prior to trial to aid the investigation or obtain needed medical treatment.

*People v. Hughes,* 59 N.Y.2d 523, 466 N.Y.S.2d 255, 265, 453 N.E.2d 484, 495 (1983).

*Accord: Stokes v. State,* 548 So.2d 188, 196 (Fla.1989); *State v. Moreno,* 68 Haw. 233, 709 P.2d 103, 104–05 (Haw.1985); *State v. Haislip,* 237 Kan. 461, 701 P.2d 909, 926 (1985), *cert. denied,* 474 U.S. 1022, 106 S.Ct. 575, 88 L.Ed.2d 558 (1985); *State v. Koehler,* 312 N.W.2d 108, 110 (Minn. 1981); *State v. Tuttle,* 780 P.2d 1203, 1211 (Utah 1989), *cert. denied,* 494 U.S. 1018, 110 S.Ct. 1323, 108 L.Ed.2d 498 (1990); *Hall v. Commonwealth,* 12 Va.App. 198, 403 S.E.2d 362, 370–71 (1991); *State v. Martin,* 101 Wash.2d 713, 684 P.2d 651, 656 (1984).

#### b. The Proceedings at McGlauflin's Trial

A.C.'s mother testified that she and her husband moved to Fairbanks in 1974; A.C. was born there in 1975. McGlauflin, who rented a room in the home of A.C.'s babysitter, met A.C. when she was five or six years old. McGlauflin took an active interest in A.C.; he took her to ballet lessons, took her out to eat, took her camping, and taught her photography.

In the spring of 1985, A.C.'s mother divorced her husband and, with the two girls, moved from Alaska to Nevada. At that time, A.C. was nine years old. After this move, A.C.'s mother noted a change in her daughter's behavior. A.C.'s self-esteem was very low, and she became hostile and depressed. She started "partying", wearing black clothes, and wearing dark red lipstick. She cried much of the time. A.C.'s mother attributed this change in her daughter to the mother's recent divorce from A.C.'s father and other family problems.

During the next three years, McGlauflin sent A.C. several expensive gifts, among them a 35–millimeter camera and binoculars. McGlauflin also telephoned A.C. every couple of months. In the spring of 1988, after McGlauflin sent A.C. the camera, McGlauflin telephoned A.C.. A.C. refused to speak to McGlauflin; she asked her mother to tell McGlauflin that she wasn't home. Then she began crying. A.C.'s mother asked her, "Did he ever do anything to hurt you?" At that point, A.C. became very quiet; her mother suspected that something had happened between McGlauflin and her daughter, but she didn't know what. When McGlauflin called back the next week, A.C.'s mother told him not to call back, not to send any more gifts, and not to communicate with her family in any way. A.C.'s mother "knew he had done something to her, but [A.C.] wouldn't talk about it yet."

A.C. began seeing a counselor. After three years of counseling, A.C. told the authorities that McGlauflin had sexually abused her. This report led to an Alaska State Trooper investigation and eventually a grand jury indictment against McGlauflin.

One of the witnesses at McGlauflin's trial was R.B.S., the woman who had babysat A.C. in Fairbanks and who had lived in the same house as McGlauflin. After A.C. had filed her report of sexual abuse, Alaska State Trooper Theodore Norris contacted R.B.S. and asked her to engage McGlauflin in conversation about the alleged abuse so that the conversation could be recorded

pursuant to a *Glass* warrant.[5] Apparently to prepare R.B.S. for her telephone conversation with McGlauflin, A.C. spoke with R.B.S. on a few occasions. R.B.S. testified that, during one of these conversations, A.C. told her that she had been hypnotized and that, following hypnosis, she had remembered many details of the abuse that she had previously put out of her mind.

At this point, Superior Court Judge Mary E. Greene notified the prosecutor that she believed the State faced a problem under the supreme court's decision in *Contreras v. State*, 718 P.2d 129 (Alaska 1986):

> THE COURT: [If] there was hypnosis that related to memory, [A.C.'s] testimony is inadmissible unless you can ... show what [she] related before hypnosis. That part's the only part that's admissible.... The hypnotized witness may not testify to any fact not related by the witness before the [hypnosis] session.... [I]t looks to me [as if you need A.C.'s] prior statements before the hypnosis occurred.

> .    .    .    .    .

> THE PROSECUTOR: [I will make an] offer of proof [that] she remembered all of this long before that ...

> THE COURT: [The] problem is, *Contreras* ...

> THE PROSECUTOR: ... that she went to a hypnotist and, she can tell you, it was a rip-off, and she didn't remember anything different.

> THE COURT: [The] problem is, *Contreras* doesn't allow that.... There's an absolute bar, except statements that you can show were made prior to hypnosis....

> THE PROSECUTOR: Even if you could show that the hypnosis had absolutely no effect on the witness's memory[?]

> THE COURT: [The supreme court's] point is that you can't make that showing. [The] witness may believe that [the hypnosis had no effect on the witness's

memory], but [the] witness's belief ... may not be true—which is their point in *Contreras*.

The court held a hearing the next day to determine the admissibility of A.C.'s testimony. A.C. testified that she had been hypnotized once, in 1988. She had not wished to be hypnotized because she did not want to talk about being sexually molested, but she eventually agreed to go to the hypnotist for help in reducing her weight.

A.C.'s mother confirmed A.C.'s account. She testified that, a few months after the incident in which A.C. had refused to speak to McGlauflin over the telephone, A.C.'s mother asked A.C. to come with her to a hypnotist she was consulting about her own weight problem. A.C. became distraught; she told her mother that she did not wish to see a hypnotist because "you have to tell [hypnotists] everything." When A.C.'s mother asked her what she meant by this statement, A.C. responded that she feared the hypnotist "would get out of me what Biff [McGlauflin] did to me."

A.C. testified that, despite her expressed reluctance to speak about being sexually abused, her mother nevertheless informed the hypnotist at the beginning of the session that A.C. had been molested. At one point during the session, the hypnotist asked A.C. if she could see the man who had molested her; A.C. answered yes. The hypnotist then asked A.C. if she had anything to say to this man; A.C. answered no. Upon receiving this answer, the hypnotist moved on to another subject. There was no further mention of the sexual molestation during the hypnosis session.

The hypnotist confirmed A.C.'s account of the hypnosis. He testified that he had seen A.C. once, toward the end of August 1988. The session was designed to aid A.C. in dealing with her weight problem and her low level of self-confidence.

The hypnotist did not ask A.C. to recall any details of being sexually molested. Al-

---

**5.** *See Glass v. State*, 583 P.2d 872 (Alaska 1978).

though his notes from the session include the words "molested—by a friend", the hypnotist testified that this had not been the purpose of the session.[6] The session concentrated on A.C.'s weight problem and her lack of self-confidence. The hypnotist did not try to take A.C. "back" to the acts of molestation, nor did he ask her to recall the details of whatever might have happened to her. Finally, the hypnotist testified that he did not give A.C. any post-hypnotic suggestions to aid her recall of or change her attitude toward the acts of sexual abuse. He had no independent recollection of giving A.C. any kind of post-hypnotic suggestion, but he did testify that, when treating people for lack of self-confidence, he often suggests to them that they will feel more and more self-confidence after the session.

At the conclusion of this testimony, the superior court made formal findings of fact. The court found that, prior to the hypnosis session, A.C. had told her mother that McGlauflin had sexually molested her but had provided no details of the abuse. The hypnosis session occurred at the end of August 1988, and, prior to that session, the hypnotist knew nothing about any allegation of sexual abuse. The hypnosis session was not designed to enhance A.C.'s memory of the sexual abuse.

The court additionally found that, at some point during the hypnosis session, A.C. said something about the molestation. A.C.'s comment led the hypnotist to ask, "Can you see the man who molested you?" A.C. replied, "Yes." The hypnotist then asked, "Do you want to say anything to him?" A.C. replied, "No." The court found that there was no other discussion of the sexual abuse—"no visitation of the facts of the molestation, and no inquiry as to what happened when, where, or how." The court further found that "the only post-hypnotic suggestion made during the

hypnotic session was for [A.C.] to be more and more self-confident."

The superior court then ruled that the admission of A.C.'s testimony did not violate *Contreras*. The court interpreted *Contreras* to bar, not all post-hypnosis testimony of any witness who has been hypnotized for any reason, but only the testimony of a witness who has been hypnotized in an effort to refresh or enhance her memory of the events being litigated. Based on the court's findings that (1) A.C.'s hypnosis had not been directed toward enhancement of her memory, and (2) the subject of sexual abuse had come up only in passing, with no attempt to delve into the details of the abuse, the court ruled that *Contreras* did not require suppression of A.C.'s testimony.

c. The Admissibility of C.A.'s Testimony

On appeal, McGlauflin argues that the superior court should have struck A.C.'s testimony in its entirety because A.C. had previously been hypnotized and because, prior to that hypnosis session, A.C. had not told any details of the alleged sexual abuse to anyone else. (McGlauflin does not contest the superior court's finding that, prior to the hypnosis session, A.C. had confided to her mother, in general terms, that McGlauflin had abused her.)

As described above, Judge Greene concluded that *Contreras* did not bar A.C.'s testimony because (1) A.C. had not been hypnotized in an effort to revive or enhance her memory of the events being litigated, and (2) the subject of sexual molestation had come up only tangentially during the hypnosis session, with the hypnotist making no attempt to elicit details of the occurrence. These factors do indeed distinguish McGlauflin's case from *Contreras*, where the witness was hypnotized and questioned by the police for the express purpose of retrieving her memories of the

---

**6.** The hypnotist testified, in response to a leading question on cross-examination, that the sexual abuse "was something that [A.C.] brought up" spontaneously. However, the hypnotist had no independent recollection of how he learned of the sexual abuse; he based his response on

the notation "molested—by a friend" that he found in his written notes of the session. This notation could also be viewed as corroboration of A.C.'s testimony that her mother (not she herself) had mentioned sexual abuse to the hypnotist during the session.

kidnapping and assault. McGlauflin argues, however, that these factual distinctions do not exempt his case from the *Contreras* rule.

■ In *Contreras*, the supreme court described the issue to be decided as whether a witness can testify concerning "facts and recollections adduced during hypnosis" when the witness has been "hypnotized by the police in an effort to identify a suspect". 718 P.2d at 129. While this language might be interpreted as limiting the *Contreras* rule to situations in which the hypnosis was conducted by the police (or a police agent) for avowedly forensic purposes, we agree with McGlauflin that the hypnotist's motive is not determinative of whether the witness can later testify.

On virtually every page of the *Contreras* opinion, either in text or footnote, the supreme court refers to the questioned testimony as "hypnotically generated", "hypnotically refreshed", "hypnotically adduced", "hypnotically induced", or "hypnotically aided recall".[7] While it is possible to read *Contreras* as applying only to police use of hypnosis for the purpose of investigating crimes[8], we conclude that *Contreras* applies to any situation in which a witness's memory has been enhanced or altered by hypnosis, regardless of the motive of the hypnotist. Under the facts of *Contreras* (a witness hypnotized by the police in an express effort to retrieve memories of a criminal occurrence), there was an obvious and substantial risk that the witness's resulting testimony was hypnotically "refreshed" or "adduced"—i.e., that hypnosis had affected the witness's memories of the occurrence. This risk led the supreme court to bar the witness from testifying unless the State could show that the witness had made pre-hypnosis state-

ments containing the same factual assertions. However, hypnosis performed for non-forensic purposes may also result in altered memory; and, when this is true, the *Contreras* rule should apply.

Given the flurry of judicial decisions concerning hypnosis in the 1980s, one would expect that other states by now would have confronted cases like McGlauflin's, in which a witness hypnotized for a non-forensic purpose was later called to testify in a criminal case. Surprisingly, few cases deal with this issue. However, McGlauflin cites a New York case, *People v. Schreiner*, 77 N.Y.2d 733, 570 N.Y.S.2d 464, 573 N.E.2d 552 (1991), for the proposition that a witness's previous hypnosis has the same legal consequence regardless of whether the hypnosis was performed for investigative or medical purposes.

The defendant in *Schreiner* had been found not guilty of attempted murder by reason of insanity and had been committed to a hospital for the criminally insane. Several years later, the hospital authorities recommended that he be transferred to a non-secure facility. Preparatory to this transfer, Schreiner was examined by a psychiatrist. During this examination, Schreiner confessed to killing a man in a New York City alley in 1979. After Schreiner was charged with this murder, he asked the court to suppress his confession, asserting that it was the product of hypnosis. *Id.*, 570 N.Y.S.2d at 465, 573 N.E.2d at 553.

It turned out that, while Schreiner was in the hospital, he had been receiving therapy from a psychologist. Schreiner had told the psychologist that he was "troubled" by an incident that had occurred in an alley, but at the same time Schreiner asserted that he did not believe he had committed

---

7. Like our supreme court in *Contreras*, courts from other states describe the problem as the use of hypnosis to "aid" memory, to "retrieve" memory, to "restore" memory, to "expand" or "improve" memory, or to "enhance" or "refresh" memory. Perhaps the Minnesota Supreme Court best described the perceived danger when it referred to using hypnosis "to create a witness". *State v. Mack*, 292 N.W.2d 764, 771 (Minn.1980).

8. The court decisions from other states that the supreme court quoted and relied on in *Contreras—People v. Hughes*, 59 N.Y.2d 523, 466 N.Y.S.2d 255, 453 N.E.2d 484 (N.Y.1983), *State v. Peoples*, 311 N.C. 515, 319 S.E.2d 177 (1984), and the many decisions listed in footnote 14 of *Contreras*, 718 P.2d at 133–34 all deal with hypnosis employed as an investigative tool for forensic purposes.

murder. The psychologist responded, "You know, Rick, I think you probably did." 570 N.Y.S.2d at 466, 573 N.E.2d at 554.

The psychologist later received permission to hypnotize Schreiner as part of a course of therapy to alleviate Schreiner's feelings of guilt and depression. Not only did the psychologist hypnotize Schreiner every few weeks, but she also taught him how to hypnotize himself. She suggested to Schreiner that, "when he was ready to deal with the events of whatever night it was, he would begin to remember them". *Id.*, 570 N.Y.S.2d at 466, 573 N.E.2d at 554. Soon after, while under self-hypnosis, Schreiner "recalled" that he had murdered the man in the alley. At the pre-trial hearing, the psychologist testified that she believed that Schreiner's confession to this murder resulted from the hypnosis therapy or from post-hypnotic suggestion. *Id.*

As noted above, New York follows the majority rule that hypnotically adduced testimony is inadmissible. *People v. Hughes*, 466 N.Y.S.2d at 265, 453 N.E.2d at 495. However, the trial judge in *Schreiner* found, as a factual matter, that Schreiner's confession to the murder had not been the product of hypnosis and therefore the rule of exclusion did not apply. The New York Court of Appeals reversed the trial court's decision because it concluded that the trial judge's finding of fact was clearly erroneous. 570 N.Y.S.2d at 466–67, 468, 573 N.E.2d at 554–55, 556. The court stated:

> The conclusion is ... inescapable that [the defendant's] recollection was the result of hypnotic therapy and posthypnotic suggestion. Because such recollections are inherently unreliable, the defendant's statement should not have been admitted in evidence against him.

*People v. Schreiner*, 570 N.Y.S.2d at 468, 573 N.E.2d at 556.

We agree with McGlauflin that *Schreiner* stands for the proposition that both forensic and therapeutic hypnosis can taint a witness's memories and thus render the witness's testimony inadmissible. However, it is important to note that, even though the hypnosis in *Schreiner* was conducted for therapeutic purposes, its avowed aim was memory enhancement: one of the explicit goals of the hypnosis was to uncover or elicit Schreiner's memories of what had happened in the New York City alley in 1979. Given this fact, the New York court concluded that Schreiner's "recollection" of the murder was "inescapabl[y] ... the result of hypnotic therapy and posthypnotic suggestion".

The same is true of two other cases McGlauflin cites. In both *State v. Martin*, 101 Wash.2d 713, 684 P.2d 651 (1984), and *State v. Grimmett*, 459 N.W.2d 515 (Minn. App.1990), crime victims were hypnotized by therapists, not police investigators. However, in each case, the explicit purpose of the hypnosis was to uncover the victim's repressed memories of the crimes being litigated; in each case, the therapist apparently questioned the victim in detail about the suspected crimes. *Martin*, 684 P.2d at 652–53; *Grimmett*, 459 N.W.2d at 516–17. Thus, the courts in *Martin* and *Grimmett*, like the New York Court of Appeals in *Schreiner*, could justifiably conclude that the witnesses' resulting testimony was presumptively hypnotically adduced.

This brings us to the second crucial aspect of *Schreiner*. The New York Court of Appeals clearly viewed the issue of whether a witness's memory had been enhanced or altered by hypnosis as an issue of fact:

> [W]e reject the People's contention that there is factual finding that [Schreiner's] statement was not the product of hypnosis, which is beyond our power of review. Although this Court is not empowered to [redetermine] questions of fact, we may examine the legal sufficiency of the evidence purporting to support that [factual] determination.... Thus, we may determine whether this record contains any evidence sufficient to support the conclusion that defendant's confession was "not the product of hypnotic suggestion or confabulation."

*Schreiner*, 570 N.Y.S.2d at 466–67, 573 N.E.2d at 554–55. As we noted above, the New York court ultimately concluded that

the record "inescapabl[y]" demonstrated that Schreiner's confession to the murder was "the result of hypnotic therapy and post-hypnotic suggestion", and that therefore the trial court's finding to the contrary was clearly erroneous. However, the New York court's analysis of this question also inescapably leads to the conclusion that, if the trial court's ruling had been supported by substantial evidence, the appeals court would have affirmed that ruling (even if there had been conflicting evidence on this point).

Other courts agree with the New York Court of Appeals: whether the circumstances and results of a hypnosis session demonstrate a likelihood that the witness's memory has been enhanced or altered by hypnosis is a question of fact. The issue is to be decided by the trial court in the first instance, and the trial court's decision is to be affirmed unless it is clearly erroneous.

For instance, sometimes there is conflicting evidence as to whether the witness ever actually went into a hypnotic state during a hypnosis session—obviously, a crucial factor in the decision whether to allow the witness to testify. (If the witness was not actually hypnotized, then the witness's testimony is freely admissible.) Even California (which has probably the country's strictest limitation on hypnotically adduced testimony) views this question as a factual question to be determined by the trial court. *People v. Johnson,* 47 Cal.3d 1194, 255 Cal.Rptr. 569, 586–87, 767 P.2d 1047, 1064–65 (1989), *cert. denied,* 494 U.S. 1038, 110 S.Ct. 1501, 108 L.Ed.2d 636 (1990), *reh'g denied,* 495 U.S. 941, 110 S.Ct. 2196, 109 L.Ed.2d 524 (1990); *People v. Caro,* 46 Cal.3d 1035, 251 Cal.Rptr. 757, 764–65, 761 P.2d 680, 687–88 (1988), *cert. denied,* 490 U.S. 1040, 109 S.Ct. 1944, 104 L.Ed.2d 414 (1989). The New Mexico Court of Appeals also agrees with this view of the matter:

Our task is not to reweigh the evidence to determine whether the child was or was not hypnotized during the sessions, but only to determine whether the [trial]

court's decision is supported by substantial evidence.

*State v. Clark,* 104 N.M. 434, 437, 722 P.2d 685, 688 (1986), *cert. denied,* 104 N.M. 378, 721 P.2d 1309 (N.M.1986). *Accord United States v. Bourgeois,* 950 F.2d 980, 984–85 (5th Cir.1992); *Johnson v. State,* 472 N.E.2d 892, 909 (Ind.1985). See *Garcia v. Scimemi,* 712 P.2d 1094 (Colo.App.1985), in which an appellate court reversed a trial court's finding that a witness *had* become hypnotized during a hypnosis session because the appeals court found that the trial court's ruling was clearly erroneous.

Similarly, even when it is undisputed that the witness was previously hypnotized, a second question of fact remains: do the circumstances and results of the hypnosis session demonstrate a likelihood that the witness's memories of the events being litigated were enhanced or altered by hypnosis? In *People v. McKeehan,* 732 P.2d 1238 (Colo.App.1986), *cert. dismissed,* 753 P.2d 243 (Colo.1990), the Colorado Court of Appeals confronted a case in which a witness had undergone hypnosis to ease her anxiety before taking the witness stand at the defendant's trial. As the court stated the facts:

[T]he victim had undergone hypnotic relaxation therapy by a mental health counselor before testifying. This "hypnosis" consisted of physical relaxation, deep breathing, and visualizing being in a pleasant place. She was not questioned and no suggestions were made to her under hypnosis; rather, the sole purpose of the hypnosis was to allow her to relax and overcome her anxiety about testifying.

*People v. McKeehan,* 732 P.2d at 1239. The Colorado Court of Appeals upheld the trial court's finding that, because this hypnosis session did not include techniques likely to enhance or alter the witness's memory, the hypnosis had not produced or affected the witness's memories of the crime, and thus the witness could testify. *Id.* at 1239–1240.[9]

---

**9.** As noted on the first page of the reported decision in *McKeehan,* the Colorado Supreme Court granted certiorari of the court of appeals's decision. However, after the case was briefed to the supreme court, the supreme court decid-

Similarly, in *State v. Clark*, 722 P.2d at 690, the New Mexico Court of Appeals allowed a previously hypnotized witness to testify when the trial court found that the hypnosis session had not affected the witness—that the witness's memories were not the product of hypnosis:

> Here, in addition to the overwhelming evidence that the hypnotic procedure was inept and ineffective, we have uncontroverted testimony that no information of any kind was conveyed to, or elicited from, the child.... The evidence before the trial court provided a substantial basis for the trial court's conclusion that the child's identification [of the defendant] was not a product of hypnosis.

A third instructive case is *United States v. Gatto*, 924 F.2d 491, 495–97 (3rd Cir. 1991). *Gatto* involved a prosecution for a murder that had occurred in 1979. Shortly after the killing, a witness was hypnotized by the police in an attempt to retrieve his memories of the men he saw running away from the scene of the homicide. Ten years later, the federal government indicted the defendant for the murder, and the defendant asked the trial court to bar the previously hypnotized witness from testifying at trial.

Responding to the defense motion, the government presented the testimony of Dr. Martin Orne, a recognized authority on hypnosis. Dr. Orne told the federal district court that the effects of hypnotic suggestion decrease over time, and that it was "just almost impossible" for a 10–year–old hypnosis session to produce a suggestive effect on a witness's recollection. 924 F.2d at 497. Based on this testimony and the consistency of key aspects of the witness's account before and after hypnosis, the Third Circuit reversed the trial court's decision barring the witness from testifying at the defendant's trial. Treating the issue of whether the hypnosis session had affected the witness's memory as an issue of fact, the Third Circuit pointed out that "the gov-

ed that certiorari had been improvidently granted. 753 P.2d 243.

ernment's unrebutted testimony is inconsistent with a finding that the hypnotism had an effect on [the witness's] account of the ... murder"; thus, the trial judge's finding to the contrary was clearly erroneous. *Id.* at 497.

We believe these cases point to the proper interpretation of the scope of the *Contreras* decision. The rule of prohibition announced in *Contreras* unquestionably applies when the circumstances and results of the hypnosis session demonstrate a likelihood that the hypnotized witness's memories of the events being litigated have been enhanced or altered by hypnosis. This will be true whenever a witness has been hypnotized for forensic purposes and interrogated concerning the events being litigated (as was the case in *Contreras*).

In such circumstances, *Contreras* holds that the witness's memories are presumed hypnotically adduced. The State can overcome this presumption only by showing that the witness, prior to being hypnotized, had those same memories.[10] If the State fails to overcome the presumption that the witness's memories are hypnotically adduced, then the witness cannot testify about the events being litigated—because any memory that is hypnotically adduced is, under *Contreras*, conclusively unreliable. (*Contreras* does not allow a party to try to show, through extrinsic corroboration, that a witness's hypnotically adduced memories are reliable.)

On the other hand, there are times when, even though a witness has been hypnotized, the circumstances and results of the hypnosis session make it likely that the witness's memories have not been enhanced or altered by hypnosis. In such cases—exemplified by *McKeehan, Clark,* and *Gatto*—there is no presumption that the witness's memory is untrustworthy, and thus the witness will be allowed to testify.

**10.** *But see United States v. Gatto,* 924 F.2d 491 (3rd Cir.1991), discussed above, suggesting that the presumption may be more broadly rebuttable (an issue we need not address here).

In McGlauflin's case, A.C. was undisputedly hypnotized. However, the superior court found that A.C. had been hypnotized only once, and that this hypnosis had been conducted, not to elicit or enhance A.C.'s memories of sexual abuse, but to help her deal with a weight problem and to increase her self-confidence. The superior court further found that, even though the hypnotist had been apprised of A.C.'s assertion that she had been sexually abused, the only mention of sexual abuse during the hypnosis session were the two questions, "Can you see the man who molested you?" (to which A.C. answered "yes") and "Do you want to say anything to him?" (to which A.C. answered "no"). These findings are not clearly erroneous.[11]

Judge Greene found, from these circumstances of the hypnosis session, that A.C., though hypnotized, had not been questioned about sexual abuse in a way that would enhance or alter her memories of the abuse. Judge Greene therefore concluded that the prophylactic rule established in *Contreras* did not apply to A.C..

We agree. The *Contreras* rule is designed to insulate judicial decision-making from the false "memories" that can be created when hypnosis is employed to refresh or enhance a witness's recollection of events. But, as the courts ruled in *McKeehan, Clark,* and *Gatto,* this danger does not arise from the simple experience of hypnosis itself. Rather, the danger is created when the hypnosis session is aimed at reviving or enhancing a witness's memories, or when (regardless of the hypnotist's subjective aim) the session is conducted in a manner that makes it likely that hypnosis has enhanced or altered the witness's memories of the events being litigated.

In McGlauflin's case, the superior court concluded that A.C.'s hypnosis experience had not created or altered her memories of the sexual abuse. The record supports this conclusion. A.C. had gone to the hypnotist seeking help for her weight problem and her lack of self-confidence, not to be counseled for sexual abuse. The hypnotist was cursorily informed, at the beginning of the session, that A.C. claimed to have been sexually abused; during the time that A.C. was under hypnosis, the subject of sexual abuse was mentioned in only a tangential, limited way. (We also note that, because the hypnosis session occurred three years before A.C. reported the alleged sexual abuse to the authorities, the hypnotist clearly did not learn any facts or theories concerning the sexual abuse from any police or prosecution agency.)

On appeal, McGlauflin argues that even the single question, "Can you see the man who molested you?", might have created false memories of abuse or might have caused A.C. to merge her memories of McGlauflin with memories of sexual abuse she had suffered at someone else's hands. This court does not possess the scientific expertise to evaluate McGlauflin's argument unaided. It is conceivable that McGlauflin's assertion has some scientific basis, but he has not provided us with any testimony or scientific literature to evaluate the plausibility of his assertion.

The crucial feature of McGlauflin's case is that, unlike the situation presented in *Contreras,* the circumstances surrounding A.C.'s hypnosis do not, in themselves, give rise to a presumption that A.C.'s memory was hypnotically altered or enhanced. The question of whether A.C.'s memory was adduced by hypnosis is therefore an

---

**11.** McGlauflin argues that *Contreras* bars the superior court from relying on A.C.'s testimony to determine the content of the hypnosis session. *Contreras* does not directly question the reliability of a witness's memory of the hypnosis session (as opposed to the witness's memories of prior events adduced under hypnosis). However, even if a hypnotized person's account of an hypnosis session should be viewed with suspicion, the superior court could properly credit A.C.'s testimony in this case.

The hypnotist himself testified; his account of the session did not vary materially from A.C.'s. In particular, the hypnotist corroborated A.C.'s assertion that the discussion of sexual abuse had been both cursory and peripheral to the purposes of the hypnosis. In fact, until he was prompted, the hypnotist did not even recall that the subject of sexual abuse had been discussed during the session.

issue of fact to be decided by the trial court in the first instance. The question confronting this court is whether Judge Greene's findings of fact are clearly erroneous.

Judge Greene recognized the *Contreras* problem as soon as it surfaced, and she held a full hearing on the circumstances of A.C.'s hypnosis. From the evidence presented at that hearing, Judge Greene concluded that the events of the hypnosis session had not affected A.C.'s memories of the sexual abuse. The judge's conclusion is supported by substantial evidence.[12]

In the trial court, though McGlauflin argued that even a single question asked under hypnosis might have tainted A.C.'s memory, he presented no evidence (expert testimony, lay testimony, or scientific literature) to support his assertion. We must evaluate Judge Greene's findings in light of the evidence she heard. Based on that evidence, we cannot say that her conclusion is clearly erroneous. We therefore affirm the superior court's ruling that the hypnosis session did not enhance or alter A.C.'s memories of the events being litigated at McGlauflin's trial. Because the facts and recollections contained in A.C.'s testimony were not "adduced during hypnosis", *Contreras*, 718 P.2d at 129, the *Contreras* rule does not bar A.C.'s testimony.

## Conclusion

McGlauflin's convictions are REVERSED. The superior court's ruling on the admissibility of A.C.'s testimony is AFFIRMED.

---

**12.** The Alaska Supreme Court recently addressed the concept of "substantial evidence" in *Smith v. Sampson*, 816 P.2d 902, 904 (Alaska 1991):

> Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Storrs v. State Medical Board*, 664 P.2d 547, 554 (Alas-

ka 1983), *cert. denied*, 464 U.S. 937, 104 S.Ct. 346, 78 L.Ed.2d 312 (1983). In applying this standard, "the reviewing court does not reweigh the evidence or choose between competing inferences; it only determines whether such evidence exists." *Id.* (Citing *Interior Paint Co. v. Rodgers*, 522 P.2d 164, 170 (Alaska 1974)).